The CIT GROUP, INC., a Delaware corporation, Plaintiff,

v.

CITICORP, a Delaware corporation, Defendant.

Civ. A. No. 98–3066.

United States District Court, D. New Jersey.

Sept. 25, 1998.

Carella, Byrne, Bain, Gilfillan, Cecchi, Stewart & Olstein by John G. Gilfillan III, Charles C. Carella, Jan A. Brody, Carl R. Woodward III, Elissa Mizzone, Roseland, NJ, and Kane, Dalsimer, Sullivan, Kurucz, Eisele and Richard LLP by Siegrun D. Kane, David H.T. Kane, New York, NY, for Plaintiff.

Whitman Breed Abbott & Morgan LLP by Stephen W. Feingold, Carole E. Klinger, Stephanie M. Foster, New York, NY, and Shearman & Sterling by R. Paul Wickes, Jaculin Aaron, John Gueli, Michael P. Dierks, New York, NY, and Weinberg Sullivan P.C. by Steven M. Weinberg, Phoenix, AZ, and Skadden Arps Slate Meagher & Flom by Kenneth A. Plevan, New York, NY, for Defendant.

## *OPINION*

DEBEVOISE, Senior District Judge.

Plaintiff, The CIT Group, Inc., a Delaware corporation, ("CIT Group") instituted this trademark infringement action against defendant, Citicorp, also a Delaware corporation, ("Citicorp"). On April 6, 1998 Citicorp and Travelers Group, Inc. ("Travelers") announced plans to merge, disclosing that the merged entity proposed to carry on the combined business of these two financial giants under the name CITIGROUP. CIT Group's complaint alleges that this use of the name would constitute a violation of its statutory and common law trademark rights, would dilute its trademark rights and would constitute unfair competition.

CIT Group sought injunctive relief. The parties pursued an accelerated discovery schedule, and an evidentiary hearing was conducted on August 25–28, 1998. By agreement of the parties the trial of the action on the merits was advanced and consolidated with the application for a preliminary injunction. Fed.R.Civ.P. 65(a)(2).

### I. *The Businesses of the Parties*

Citicorp is a holding company which engages in a wide range of financial services businesses through many subsidiary operating corporations. The most prominent of these subsidiaries is Citibank. Citibank began business in 1812 when it was chartered in New York as City Bank of New York. Through the years it changed its name from time to time: National City Bank of New York, First National City Bank of New York, and then First National City Bank. In the

1960's it started using the name "Citibank" and registered it as a trademark.

The mark "CITI" was widely used and advertised. It became a prefix for many names of enterprises in the Citicorp empire, e.g., CITICARD, THE CITI NEVER SLEEPS, CITIGOLD, CITIPAY. Through Citibank and its other subsidiaries Citicorp engages in the full range of banking and financial services—lending, accepting deposits, issuing certificates of deposit, transferring money, engaging in retirement planning, performing corporate trust activities, providing investment advice and services, issuing letters of credit, serving as a fiduciary and providing a multitude of other financial services.

Citicorp's operations are worldwide. For example, it conducts branch banking in 100 countries. More than half the households in the United States have a business relationship with Citibank and 25 million households have Citibank credit cards. It is estimated that the entity resulting from the proposed merger of Citicorp and Travelers will have managed assets of $700 billion and net revenue of $50 billion.

In 1908 CIT Group commenced operations in St. Louis, Missouri, under the name Commercial Investment Trust. It engaged in various forms of commercial lending and grew and expanded throughout the United States.

Originally CIT Group engaged in accounts receivable financing and factoring. In 1916 it became the first financer of automobiles in the United States. At one time it was the largest such financer in this country.

In the 1920's the company expanded into most of its present businesses in the field of asset based financing. It was one of the first companies to enter the home equity market. For a period it became a bank holding company, engaging in a wide variety of banking, insurance and manufacturing activities until it was acquired in 1980 by RCA Corporation and in 1984 by Manufacturers Hanover Corporation, which took over a number of the company's operations.

Manufacturers Hanover divested itself of the financial services aspect of the operation, but imposed a restriction which prevented the company from reentering the home equity business until late 1992.

Presently CIT Group is a subsidiary of a huge Tokyo bank—The Dai–Ichi Kangyo Bank, Ltd., which holds 95% of the voting shares and 76% of the total capital stock of CIT Group. Since November 1997 CIT Group has been a public company with 13,000 shareholders. In 1997 its managed assets were $22.3 billion and its net income was $2.1 billion.

In many areas CIT Group and Citicorp do not compete, as Citicorp provides many financial services which CIT Group cannot or has not elected to provide. For the purposes of this case, however, the areas in which the two entities provide similar or related services must be examined in some detail as a prelude to addressing the ultimate issue of likelihood of confusion.

CIT Group's services are denominated Commercial Services and Consumer Services, the former constituting 70% of its business and the latter 30%. Commercial Services has units engaging in (i) Equipment Financing and Leasing, (ii) Factoring, (iii) Commercial Finance and (iv) Venture Capital. Consumer Services has units engaging in (i) Home Equity Lending and (ii) Sales Financing. Details concerning these units are set forth in Plaintiff's Exhibit 66, attached hereto as Appendix A.

**A.** *Equipment Financing and Leasing:* The CIT Group serves a wide variety of industries and markets, including the construction industry, commercial aircraft, transportation, materials handling and data processing. It offers direct loans and leases to enable customers to acquire equipment. It provides floor planning for dealers. It finances manufacturers, dealers, distributors and end users, operating in the low level market ($250,000 or less), the middle market ($250,000 to $5,000,000) and the large ticket market ($5,000,000 and more).

Fifty percent of the new business of this unit comes from existing customers. To pursue new business it engages in direct communication with potential customers; it advertises in Forbes, The Wall Street Journal,

newspapers and industry magazines; its representatives attend conventions and trade shows; it engages in telemarketing and direct mail. All this is done under its name The CIT Group; there is frequent use of its logo in print material.

CIT Group Capital Finance, Inc.'s Aerospace Group seeks opportunities to finance aircraft worldwide. It may acquire equity in aircraft and lease, or it may lend. To secure this business CIT Group meets directly with airlines and manufacturers and it receives proposals from intermediaries. It makes its approaches through telephone calls, advertising and attendance at trade shows. The advertisements appear in trade publications such as Airline Business, Air Transport World and Air Finance Journal. It is a member of the International Society of Transport Aircraft Trading. CIT Group's aircraft transactions range from $10 million to $300 million in size.

The second component of CIT Group Capital Finance is financing freight cars, locomotives and other railroad equipment. This is accomplished through operating leases, tax leases and secured loans for railroad equipment. Transactions range from $5 million to $50 million in size. The customers include all railroads in the United States, Canada and Mexico. At the present time there are only six Class One railroads in the United States and two in Canada.

Business is obtained through direct calls on railroads, shippers and manufacturers of rail cars and locomotives. Calls are made on intermediaries who are likely to refer potential customers. CIT Group places advertisements in trade journals such as Progressive Railroading and Railway Age; representatives attend industry conferences; direct mailings are sent out.

CIT Group estimates that there are 600 potential customers for its Capital Finance financial services. It presently deals with 75 of them, leaving a potential market of 85% of the total. Railroads are structured by commodity, and therefore there may be as many as 45 persons within each Class One railroad with whom a person seeking business would have to deal when seeking business.

The third component of CIT Group Capital Finance is financing intermodal equipment. This service is marketed in a manner similar to the marketing of rail financing services.

A number of Citicorp units engage in equipment financing and leasing. Its Global Aviation Group provides a wide range of services to the aviation industry; it holds an equity position in aircraft leases and engages in some debt transactions. Presently the aircraft portfolio of one Citicorp subsidiary consists of 35 commercial aircraft having a book value of $340 million. Its current strategy is to sell aircraft subject to leases and to concentrate on advisory services to airlines. It communicates with airline customers directly and monitors delivery schedules of commercial aircraft manufacturers. With this information it prepares "pitch books" to provide prospective customers.

Both CIT Group and Citicorp units are members of the International Society of Transport Aircraft Trading. Although at this time CIT Group buys and holds aircraft and Global Aviation Group is primarily a seller of aircraft and a provider of services, the two entities compete for deals in the marketplace.

Citicorp units engage heavily in asset based lending, serving most of the industries which CIT Group serves—aviation, apparel manufacturers and retailers, home furnishing, textiles, consumer electronics, machine tools and many others. Citicorp concentrates on larger loans, typically $75 million or more, and larger borrowers. Ninety percent of its asset based loans are for $75 million or more.

Potential borrowers are identified in three ways. The first is through internal referrals. Citicorp has an entity known as the Global Relationship Bank ("GRB"). GRB seeks to provide the widest range of advisory and financial services to major corporations. It has 1500 customers in this category with which it maintains a continuing, direct institutional relationship. To each of these customers there is assigned a Relationship Manager ("RM") whose responsibility it is to suggest means of meeting the customer's financial needs. Thus if a customer in the machine tool industry requires equipment fi-

nancing, the RM will refer it to the Citicorp unit providing such financing.

The second way in which Citicorp obtains equipment financing customers is through referrals from intermediaries such as investment bankers, accountants or lawyers. The third way in which Citicorp obtains such customers is through solicitations in telephone calls, personal meetings and presentation of proposals.

There is direct competition between CIT Group and Citicorp units in the field of equipment financing in the mid-range of loans. Both are members of the Equipment Leasing Association of America. Its directory lists as members CIT Group Equipment Leasing Association, Citicorp Leasing, Inc., and Citicorp Global.

Citicorp Capital Industries Financing finances rail cars, ships and other large items of equipment. CitiRail is a part of this unit. All of the units are a part of Citicorp Global Equipment Finance, which has $5 billion in outstanding financing and leasing assets and engages in $3 billion of transactions each year. Of Global Equipment Finance's customers 95% are GRB customers and were referred through RMs.

The primary financing of Citicorp Capital Industries Finance is for rail cars and ships. The rail business is derived from two sources: (i) referrals from GRB and (ii) responding to requests for proposals. The objective is to find clients who have both equipment and financing needs and to fill that need, as distinguished from buying the equipment and then finding a lessee. When a lease terminates efforts are made to extend the lease to the current lessee and, failing that, to sell or place it with another current customer or with a non-customer. Personal relationships are important in deriving business, whether it consists of the 90% referred by GRB or whether it is non-GRB business.

CIT Group competes with Citicorp's CitiRail in all areas of activity and has purchased transactions from CitiRail. Both are active in the American Association of Railroads and other trade associations. Both are listed in the Railroad Financial Deskbook. Citicorp is seeking to expand its intermodal financing and is entering into competition with CIT Group in this field.

**B. *Factoring:*** CIT Group is the largest of 14 lenders providing factoring services. Its customers are in the apparel, textile, furniture, housewares and other consumer businesses. It receives its customers through direct communication, intermediaries and referrals. It holds $2.3 billion of factoring assets.

Citicorp withdrew from factoring activities, has not reentered the field and has no present intention of doing so.

**C. *Commercial Finance:*** CIT Group's Business Credit division provides senior working capital and term loans to facilitate debt restructuring, debtor in possession financing and growth capital. Loans are on a senior secured basis. Targeted are middle market companies in retail, manufacturing, electronics/technology, chemicals, or other industry in which hard assets are available for security. Loans range from $10 million to $300 million.

These financial services are marketed by calling on intermediaries (financial advisors, investment bankers, venture capital firms) and by calling on prospect companies directly. When making these calls the initial communications may be with lower level, nonfinancial employees.

This unit of CIT Group advertises in trade journals and regional publications. It places tombstone advertisements listing CIT Group Business Credit as the lead lender. Membership is maintained in the Commercial Finance Association and Turnaround Management Association.

Citicorp competes with CIT Group only to a limited extent in this field. Both a Citicorp unit and CIT Group are members of the Commercial Finance Association.

**D. *Venture Capital:*** CIT Group Equity Investments is the private equity arm of CIT Group. It received $100 million from the parent corporation to invest in growth and expansion financings and $50 million for investment in partnership interests in buy out and venture capital funds. CIT Group Venture Capital, a subsidiary of Equity Invest-

ments, operates as a Small Business Investment Company ("SBIC").

The combined portfolio contains 35 transactions, aggregating $80 million. Transactions range from $5 to $60 million. Group Equity and Venture Capital participate in auctions and approach business owners and intermediaries in their search for business opportunities. They advertise in business trade journals, issue press releases, place tombstone advertisements and attend trade shows.

Citicorp Venture Capital Limited is a subsidiary of Citicorp. It is licensed as an SBIC. It does not provide money to rapidly growing companies in their formative years; rather it is a leveraged buy out group.

Venture Capital engages in relatively few transactions. Great research is required before entering into them. It has closed a total of 130 transactions—25 in the last year. Outlays for each range from $4 to $50 million. It has a total of $2.6 billion managed assets.

Venture Capital advertises in The Wall Street Journal and Barron's. It receives presentations from investment banks; it targets its own prospects; and some prospects approach Venture Capital directly.

CIT Group's and Citicorp's venture capital units compete with each other and on occasion have participated in the same transaction. Both advertise in The Wall Street Journal and belong to the same trade association. Travelers' subsidiary Salomon Smith Barney also competes with CIT Group in the venture capital area.

**E. Home Equity Lending:** Through offices located throughout the United States CIT Group extends first and second mortgages. These include home equity mortgages and, to a lesser extent, purchase money mortgages. It holds $2.6 billion of such assets. CIT Group deals directly with borrowers; it receives referrals from mortgage brokers and mortgage bankers; and it purchases portfolios.

CIT Group seeks to reach customers directly through print ads in newspapers, radio and TV announcements, telemarketing and direct mailings. It obtains lists from vendors who are requested to provide names of persons meeting specified qualifications. CIT Group employees make telephone calls.

CIT Group accepts borrowers who have an A credit rating, i.e., less than a prime A+ rating. Potential customers are asked to respond through an 800 number to begin the loan process. If the caller wishes to proceed he/she is put in touch with a "mortgage professional."

CIT Group establishes booths at conventions of the brokerage community. The booths are identified by a banner reading "CIT Consumer Finance." The marketing budget in 1998 is $1.2 million, most of which is directed to the brokerage community.

CIT Group's home equity loan portfolio of $2.6 billion is derived 65% from retail mortgage brokers, 25% through the purchase of portfolios and 10% from direct consumer solicitations.

Both Travelers and Citicorp engage heavily in home equity mortgage lending. Citicorp seeks A+ and A credit consumers in all age groups. It identifies a large percentage of its prospects through its own extensive customer base. It also purchases lists to reach non-customers.

Customers are reached through bank statement inserts and branch bank promotions. A wider group is approached through direct mail, radio and television, newspaper advertising and telemarketing. Community groups refer members to Citicorp banking offices. Presently Citicorp does not use brokers in marketing home equity loans and does not acquire third party portfolios.

CIT Group competes with Travelers and Citibank branches in the field of home equity and purchase money mortgages. There are a number of mortgage lender trade associations, and CIT Group and operating companies of Citicorp and Travelers are members of many of them.

**F. Sales Financing:** This unit of CIT Group employs 600 persons and holds $4.3 billion of assets. It finances recreational vehicles, manufactured housing and recreational boats. Typically an individual consumer

will go to a dealer to make a purchase. In 50% of the cases the consumer will apply for financing. The dealer will ask the customer to complete an application, which the dealer will forward to CIT Group for approval.

In addition to financing individual purchases, CIT Group finances dealer inventory through floor planning, sending money to the manufacturer which then ships the product to the dealer. CIT Group also purchases portfolios and services portfolios for third parties, such as Chase Manhattan. At the present time CIT Group is starting to engage in auto financing.

To publicize its financing CIT Group provides dealers with banners to hang in their showrooms. One blue, horizontal banner for use in a recreational boat dealer's premises reads: "Go to Sea with CIT". To secure dealer patronage and reach individual purchasers CIT Group representatives attend boat shows and maintain booths. They distribute CIT Group handouts and call on dealers. CIT Group witnesses reported a negative attitude among dealers concerning Citicorp, arising from Citicorp's recourse policy in the past. They were fearful about any identification with Citicorp.

Citicorp Acceptance once financed recreational vehicles and recreational boats. Citicorp no longer engages in such financing and is presently liquidating its portfolio.

Citicorp's Automotive Finance Group finances light duty trucks, serving dealers through floor plan financing and end users. At present Automotive Finance provides floor plan financing to 25 dealerships in the New York City metropolitan area and to two in Connecticut. It engages in retail financing with dealerships in New York, Connecticut, New Jersey and Florida, with plans to extend its services to Maryland, Massachusetts, Illinois, California and Virginia.

The only retail automobile financing in which Citicorp engages arises when a customer enters a branch bank and receives a loan application and when Citicorp purchases retail installment contracts from dealers. Citicorp does not market or advertise direct retail auto financing. It solicits dealers by telephone, visits to the dealership or by direct mailing.

## II. *The Trademarks*

**A. *The CIT Group:*** CIT Group owns the following incontestable registrations for THE CIT GROUP and CIT covering a variety of financial services. The typography of the marks as registered is contained in Appendix B.

| Name | Reg. No./Goods/Services | Date |
|---|---|---|
| THE CIT GROUP | Financial Services, Namely Equipment Financing, Factoring, Business Credit, Sales Financing, and Capital Financing | 1,448,848<br>7/21/87 |
| THE CIT GROUP and design | Financial Services, Namely Equipment Financing, Factoring, Business Credit, Sales Financing, and Capital Financing | 1,452,503<br>8/11/87 |
| CIT in stylized type | Financial Services–Namely, the making of loans and the extension of installment credit to manufacturers, dealers, and others and their purchasers, either unsecured or secured by conditional sales contracts, chattel mortgages and similar lien documents and assignments thereof | 734,707<br>7/17/62 |
| CIT | Business and Consumer Financing and Industrial Financing Services | 1,000,360<br>12/24/74 |
| Citation System in stylized type | Financial Data Processing Services | 1,113,307<br>2/13/79 |

By reason of the filing and acceptance of affidavits under sections 8 and 15 of the Trademark law, these registrations have become incontestable and afford a conclusive presumption that plaintiff's mark is not descriptive. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 196, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

In 1986 C.I.T. Financial proposed to change its name to The CIT Group. The name suggested what in fact the company was—a group of companies and organizations providing a broad range of financial services.

During the last ten years CIT Group has spent more than $50 million in advertising under the new name. During the twelve months preceding August 1998 it spent between $6.5 and $7 million in advertising. Advertisements are placed in national publications such as The Wall Street Journal, Forbes Magazine and Business Week. In addition, operating units of CIT Group advertise in 50 or more trade journals. Besides print advertising, CIT Group sponsors such television programs as PBS's The News Hour with Jim Lehrer. It advertises on radio and television. By virtue of advertising and expanding business activities THE CIT GROUP name is known and respected in the various financial services activities in which it engages.

**B.** *Citicorp:* Citicorp owns the following registrations of the CITI mark, most of which are incontestable. (The typography of the marks as they appear in the registrations is block letters, e.g., CITI, CITIBANK, THE CITI NEVER SLEEPS).

| Reg. No. | Mark | Services | Date |
|---|---|---|---|
| 982,066 | CITICORP | Numerous financial related services | 4/9/74 |
| 1,181,467 | CITI | Financial services | 12/8/81 |
| 691,815 | CITIBANK | Banking Services | 1/19/60 |
| 1,284,589 | CITIBANKING | Banking services | 7/3/84 |
| 1,024,861 | CITICARD | Banking services-namely, check cashing services | 11/11/75 |
| 1,104,470 | THE CITI NEVER SLEEPS | Financial services, namely electronic banking services | 10/17/78 |
| 2,076,187 | CITISELECT | Mutual fund and investment management services | 7/1/97 |
| 1,824,600 | CITIGOLD | Banking services, investment consultation and asset management | 3/1/94 |
| 1,998,336 | CITITRADE | Electronic securities trading for others | 9/3/9 6 |
| 1,880,875 | CITIPHONE BANKING | Financial services; namely, providing banking services by telephone | 2/28/95 |
| 2,002,794 | CITIYIELD PLUS | Financial services, namely cash and investment management services. | 9/24/96 |
| 1,880,874 | CITICASH MANAGER | Banking services provided by electronic means | 2/28/95 |
| 1,882,737 | CITINETTING | Financial services in connection with the consolidation and manipulation of foreign exchange information provided by electronic means; computer software used for the initiation and retrieval of foreign exchange information; | 3/7/95 |
| 1,370,620 | CITI TREASURY MANAGER | Banking services | 11/12/85 |
| 1,708,618 | CITIACCESS | Banking services, fiduciary representative services | 8/18/92 |
| 1,951,364 | CITIPAY | Electronic funds transfer services, namely automatic debiting of checking accounts to pay credit card bills | 1/23/96 |

As noted above Citicorp's predecessor in 1812 used "City" in the original name City Bank of New York. During the next 150 years the various name changes always included the name "City," the last being First National City Bank. In 1960 the bank started using the name "Citibank" and thereafter used the prefix "CITI" in connection with many of its products.

Enormous sum have been expended world wide in advertising Citibank and the various Citibank and Citicorp products. Citicorp spent an estimated $1 billion $500 million for advertising in 1997. Approximately 60 to 70 percent of that sum is directed to the United States market. As a result of the advertising and the enormous scope of Citicorp's financial services activities the "CITI" name is world famous. Citicorp's advertising personnel estimate that 90% of the people in the United States would recognize the "CITI" mark. It is this prefix which is dominant when used with another name or term and which identifies the source of the service or product.

**C. _Citigroup:_** In the spring of 1998 Citicorp's chairman and chief executive officer John S. Reed and his counterpart at Travelers, Sanford I. Weill, agreed upon a merger of the banking and insurance giants. The merger would create the world's largest financial services company. It was to be a merger of equals. Citicorp's and Travelers' stockholders would share ownership of the new company; the chairmen were to serve as co-chairmen, and in all other respects the businesses and employees of the merged entities were to be on an equal footing.

On Friday, April 3, 1998 the Citicorp board of directors met to discuss the merger proposal. The discussion continued for seven or eight hours. One subject was the name of the surviving corporation, and the directors were insistent that it include the famous CITI mark. In an attempt to demonstrate that Travelers was an equal partner it was decided to take the "GROUP" from "Travelers Group" and join it with CITI to form CITIGROUP. No search or other inquiry was made as to the availability of the name, and Reed simply telephoned Weill and told him of the board's suggested name. Weill responded "fine", and that was the end of the name selection process.

The manner of configuring and presenting the new name was assigned to Citicorp's media and advertising people, who were to work with their opposite numbers at Travelers.

On Monday April 6, the merger was announced and the name of the merged entity disclosed. CIT Group's president and others in the company learned of the new name and were concerned that combining "GROUP" with "CITI" would cause confusion and, in the words of Thomas J. O'Rourke, the CIT Group vice president and director of corporate marketing, "I was concerned that they would drown the CIT Group in their backwash." (Transcript at 82). O'Rourke promptly communicated with the marketing people at Citicorp and conveyed CIT Group's deep concern about the proposed name of the merged entity. There followed a series of telephone conversations, luncheons and letters at which the subject was discussed, but it soon became evident that the Citicorp and Travelers had made a final decision about the new name.

While these discussions were proceeding, Citicorp's and Travelers' marketing and advertising personnel were conducting studies and devising the manner in which the new name would appear. It was decided to continue the use of the blue-wave background of the Citicorp logo, substituting Citigroup for Citicorp. The small "x" or "sputnik", which had been a part of the Citicorp logo would be replaced by the Travelers' red umbrella. The red umbrella had been a well-known part of the Travelers logo. The tag line or lock-up line accompanying the names of the various operating units would be changed from "A member of CITICORP" to "A member of CITIGROUP". The red umbrella was to be used at least in the tag line of former Travelers units. Appendix C portrays certain of the planned uses of CITIGROUP.

The April 6, merger announcement received extensive media coverage in the United States and elsewhere. On the same day Citicorp filed an intent to use application for the service mark CITIGROUP for a full range of insurance and financial services, banking services, credit card services, securities trading, casualty, and underwriting services and investment services.

Citicorp never definitively advised CIT Group that its choice of the name CITIGROUP was final. However, the finality of the change became unmistakably evident when Citicorp's June 16, 1998 proxy statement announced its plan to adopt and use the mark CITIGROUP for the merged entity. The merger awaited Federal Reserve Board approval, which was not expected until late August or September.

On July 7, 1998 CIT Group filed its complaint in this action seeking to enjoin the merged entity's use of the CITIGROUP name.

### III. _Conclusions of Law_

The Court has federal question jurisdiction pursuant to the provisions of 28 U.S.C.

§§ 1331, 1338(a) and 1338(b), and 15 U.S.C. § 1121(a). It has supplemental jurisdiction pursuant to the provisions of 28 U.S.C. § 1367.

Section 32 of the Lanham Act, 15 U.S.C. § 1114 protects registered trademarks and provides:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, . . .

.        .        .        .        .

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 provides protection for both registered and unregistered marks:

(a)(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbols, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .

.        .        .        .        .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

■ CIT Group's various CIT marks set forth above have become incontestable. There is a conclusive presumption that they are not descriptive. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

■ Citicorp argues that CIT Group has no statutory or common law trademark rights to the mark THE CIT GROUP in the consumer finance business because CIT Group's 1986 registration for that trademark did not include consumer finance as one of the businesses in which the mark would be used. In 1984 CIT Group went out of the consumer finance business. It reentered it in 1992 and has been engaged in it extensively ever since under the name THE CIT GROUP. For this area of its business CIT Group has acquired a common law trademark right in that name, as it has acquired a secondary meaning in the markets in which it is used. Citicorp does not dispute its statutory trademark right in the name THE CIT GROUP in all its other areas of business activity.

At its core the Lanham Act prohibits use of a mark that is likely to cause confusion, mistake or to deceive. *Interpace Corp. v. Lapp, Inc.,* 721 F.2d 460, 462 (3d Cir.1983). CIT Group has established that its CIT mark and variants thereof are valid and legally protectable. It has established that it is the owner of this mark. The critical issue is whether Citicorp's use of the mark CITI-GROUP to identify its goods and services is likely to create confusion concerning the origin of the goods and services of the parties.

It has been held that "[w]here the trademark owner and the alleged infringer deal in competing goods or services, the court need rarely look beyond the mark itself." *Lapp,* 721 F.2d at 462 (citations omitted). However, "[w]here the goods or services are not competing, this similarity of the mark is only one of a number of factors the court must examine to determine the likelihood of confusion." *Fisons Horticulture, Inc. v. Vigoro Industries, Inc.,* 30 F.3d 466, 473 (3d Cir. 1994). The inquiry is essentially the same for claims under § 1114 and § 1125.

In the present case Citicorp engages in extensive areas of business activity in which CIT Group does not compete. There are, however, certain financial services which both Citicorp and CIT Group provide and with respect to which they compete. There-

fore it is necessary to analyze the likelihood of confusion issue both by examining the mark and by consideration under the ten-factor test established in *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir.1978) and later cases decided by the Court of Appeals. These factors are:

(1) degree of similarity between the owner's mark and the alleged infringing mark;

(2) the strength of the owner's mark;

(3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4) the length of time the defendant has used the mark without evidence of actual confusion arising;

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers because of the similarity of function; and

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market.

■ CIT Group relies not only on the existence of or potential for so-called "forward confusion;" it also relies on the "reverse confusion" trademark theory: "Ordinarily, one expects that the new or junior user of the mark [Citicorp in this case] will use to its advantage the reputation and good will of the senior user [CIT Group] by adopting a similar or identical mark. Reverse confusion occurs when a larger, more powerful company [Citicorp] uses the trademark of a smaller, less powerful senior owner [CIT Group] and thereby causes likely confusion as to the source of the senior owner's goods or services." *Fisons*, 30 F.3d at 474. In reverse confusion,

the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark-its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Ameritech, Inc. v. American Information Technologies Corp.*, 811 F.2d 960, 964 (6th Cir.1987).

Whether evaluating the potential for forward or reverse confusion, it is necessary to weigh the ten *Scott Paper* factors.

■ **1. *Similarity of the Mark:*** To determine whether two marks on their face are confusingly similar the "appropriate test is not side-by-side comparison of marks, emphasizing differences in detail, but whether average consumer, on encountering one mark in isolated circumstances of marketplace and having only general recollection of the other, would likely confuse or associate the two." *Fisons*, 30 F.3d at 477, 478. The overall impression, however, will be affected by the details of each mark and the context in which the average consumer is likely to be exposed to the mark.

In the present case each mark has a dominant feature which will strike the viewer or the listener immediately: CIT in the care of THE CIT GROUP and CITI in the care of CITIGROUP. Over the years the CITI name has been extensively used in connection with banking and other financial services. Enormous sums have been spent promoting it in the United States and overseas; it is used as a prefix for a number of other words denoting various kinds of financial services, e.g., CITIBANK, CITICARD, CITIGOLD, CITIPAY. The word CITI connotes an urban metropolis and is pronounced "city." It evokes in the mind of the viewer or the listener a city and has become widely associated with the CITI aggregation of enterprises.

Since 1987 CIT Group has advertised and used THE CIT GROUP with CIT being the dominant element. The mark has a degree of recognition in the financial services markets in which CIT Group conducts business. Visually CIT does not bring anything in particular to mind, it being derived from the early name of CIT Group—Commercial Investment Trust. When spoken it is pronounced See Eye Tee. Unlike CITI, neither the written nor the spoken CIT evokes an instant image.

When written in block letters the two marks have a degree of similarity: THE CIT GROUP or CIT GROUP versus CITIGROUP. This similarity comes into play most dramatically when the names are employed on the Internet. CIT Group's domain name is WW.CITGROUP.COM. Although there is presently litigation concerning Citicorp's use of a domain name, it seeks to prevent others from using a likely domain name of the merged corporation—WW.CITIGROUP.COM. If that name were ultimately selected, the Internet would have websites identified as CITGROUP.COM and CITIGROUP.COM.

It is expected that the Citigroup logo will follow generally the format of the Citicorp logo. It will consist of dark blue letters set forth horizontally with the Travelers red umbrella appended to it. (See Appendix C). The CIT Group logo is quite different. It is presented vertically with the words on top of one another. The words "The" and "Group" are in the same format and the CIT portion is emphasized (See Appendix B, Reg. No. 1, 452, 501).

Citicorp and CIT Group also present their names in a straight line format in some contexts. For example, material descriptive of CIT Group's capital finance services is entitled THE CIT GROUP CAPITAL FINANCE. CIT Group's annual report which is distributed to 35,000 to 40,000 stockholders each year uses THE CIT GROUP in non-logo form. Material descriptive of Citicorp's venture capital operations is entitled CITICORP VENTURE CAPITAL, which presumably will become CITIGROUP VEN-

TURE CAPITAL. Even as thus presented the dominant symbols CIT AND CITI are not rendered confusing by the use of GROUP in each name, particularly when phonetically one is pronounced "See Eye Tee" Group and the other is pronounced "City" Group.

Except perhaps in the unique context of the Internet, the two names, THE CIT GROUP and CITIGROUP, do not create the same overall impression. Moreover, the similar overall impression which may be created on the Internet derives in part from dropping the "THE" from the CIT Group trademark.

■ 2. **Strength of THE CIT GROUP:** CIT Group has not pressed the strength of its mark, noting that "in a reverse confusion case, plaintiff's mark is typically weaker in the marketplace vis-a-vis defendant's ... Indeed, it is precisely because defendant can overwhelm plaintiff's identity that reverse confusion occurs." (CIT Group's Brief in Support of Injunctive Relief, at p. 12), citing *Fisons,* 30 F.3d at 479.

Despite this modest approach, the evidence suggests that in certain markets the CIT Group mark has achieved a degree of success, particularly in the fields of equipment financing and leasing and commercial finance. It has advertised both institutionally and operationally and publicized itself through numerous forms of personal contacts. Among competitors and customers in its selected areas it has achieved name recognition and a good reputation, either as CIT or THE CIT GROUP. It has achieved this status while competing with various CITI entities which have been identified by tag lines and otherwise as being "A member of CITICORP." It is unlikely that changing the tag lines to read "A Member of CITIGROUP" will dilute or diminish the CIT or THE CIT GROUP mark.

■ 3. **Consumer Attention:** The price of the goods involved and other factors indicative of the care and attention expected of consumers when making a purchase is a significant factor in determining the likelihood

of confusion—both forward and reverse. In preceding sections of this opinion appear descriptions of the six primary markets in which CIT Group conducts business. In general the transactions on the commercial side of those markets can be characterized as large scale usually involving millions of dollars, requiring extensive personal contacts with potential customers and taking time and care to consummate.

In the fields of equipment financing and leasing and commercial finance, loans or leasing transactions typically are secured by large items of equipment such as airplanes or rail cars or by a large volume of accounts receivable or inventory. Customers are derived from direct contact, from intermediaries or other referrals. In the case of Citicorp entities there is heavy reliance upon referrals from other Citicorp entities such as Global Relationship Bank. When a deal is agreed upon, typically complicated documentation must be prepared and closings held.

The participants in these transactions must of necessity have a degree of financial sophistication. In the circumstances of the commercial financial transactions in which CIT Group engages it is unlikely that participants will be confused by the CITIGROUP name or that use of that name will submerge THE CIT GROUP name or the reputation which CIT Group has gained for itself.

With respect to factoring, Citicorp does not engage in this line of activity and does not contemplate doing so. CIT Group is the largest of 14 enterprises providing such financing and there is no reason to conclude that the coexistence of a powerful CITIGROUP mark will detract from THE CIT GROUP mark established in that field.

Both CIT Group's and Citicorp's venture capital operations involve a relatively small number of large transactions which are generated through direct contacts, intermediaries or referrals. Neither confusion nor the obliteration of the CIT GROUP mark is likely in that context.

On the consumer side, CIT Group deals to a limited extent with individual homeowners. It has sought them out through TV commercials and print ads, neither of which proved particularly successful. As a result only 10% of its home equity loans is derived from direct solicitations of customers. When reaching out to customers directly, frequently the reference is to CIT, not THE CIT GROUP. The rest of the home equity loans come from retail brokers, wholesale brokers and portfolio purchases.

A home equity loan is not a transaction in which a homeowner would or could engage on the spur of the moment. Typically, in the case of CIT Group, a homeowner would respond to a TV commercial, a print advertisement or letter by calling an 800 number. The person answering the telephone would determine if the transaction should proceed further and, if so, refer the person to a "mortgage consultant" to pursue the details of a mortgage loan.

Citicorp engages in home equity loans through Citibank branches, having solicited customers by means of bank statement inserts and selective mailings. A number of steps have to be taken to complete the loan process. The likelihood of borrowers confusing the CIT Group and Citigroup during the process is small.

CIT Group engages in sales financing of recreational vehicles, manufactured housing and recreational boats. Citicorp has withdrawn from this form of lending. CIT Group's principal sources of loans of these categories are through direct arrangements with dealers, who send customer loan applications to CIT Group, and portfolio purchases. CIT Group obtains some customers directly through such means as maintaining booths at boat shows. ("Go to Sea with CIT") not ("Go to Sea with CIT Group"). The dealers and sellers of portfolios are experienced, sophisticated entities unlikely to be confused by the name CITIGROUP. The context in which a direct customer for such financing enters into a transaction is not one which is likely to produce confusion.

■ **4. *Use of CITIGROUP:*** Bearing upon the issue of confusion is the length of time a defendant has used the mark without evidence of actual confusion arising. For

many years CIT Group, Citibank, and Citicorp have engaged in financial services enterprises. In the early 1980's, CIT Group operated under the name C.I.T. Financial Corporation and Citicorp agreed to notify trade publications that Citicorp Financial, Inc. should not be referred to as Citi Financial. In addition, to avoid confusion with CITIRAIL, the CIT Group began identifying itself as CIT GROUP RAIL RESOURCES.

The use of CITIGROUP is of recent origin, and there has been little time in which actual confusion could arise. CIT Group has documented instances in which an E-mail intended for Citgroup.com was sent to Citigroup.com; a television program dealing with a dissatisfied CIT Group customer which referred to Citigroup; a gas bill addressed to Citigroup which was mailed to CIT Group; a person seeking to pay off a credit card (CIT Group does not issue credit cards) who telephoned CIT Group; a number of telephone calls revealing that the caller had confused CIT Group, Citibank, or Citigroup; a financial analyst's reports which should have been sent to a CIT Group officer but which was addressed to the officer at "Citigroup.com.;" a CIT Group financial analyst who sought to transfer his 401K plan to "Citibank as trustee for the CIT Group" but who found that it had been transferred to "Citibank Trust for Citigroup."

Certain of these episodes took place before the April 6 announcement of the Citigroup name, e.g., the television program. With respect to some of the others, it was unclear whether the mistakes involved the Citigroup or the Citibank name. Some demonstrated that when used in the context of E-mail or the Internet CITGROUP.COM and CITIGROUP.COM have an obvious potential for confusion. All of the mistakes were promptly rectified and none were made in the context of sales or solicitations of financial services. In the context of the extensive operations of CIT Group and Citicorp in the areas where they provide similar financial services, and in the further context of the extensive operations of Citicorp and its various components in other areas, these episodes are insufficient to establish a pat-

tern of confusion in the market place. *Nutri/System, Inc. v. Con–Stan Indus.,* 809 F.2d 601, 606 (9th Cir.1987).

■ **5.** *Intent in Adopting Mark:* Had Citicorp adopted the CITIGROUP mark intending either to trade on CIT Group's, goodwill or to submerge CIT Group's identity in its own, this would constitute evidence of confusion. Citicorp intended neither such outcome. It was at the outset, however, completely indifferent to the question whether the name CITIGROUP would impinge on another name. The Citicorp board concluded that CITIGROUP would preserve the strong CITI mark and would link it with the GROUP part of Travelers' name. Reed and Weill accepted this solution without having a trademark search made and without conducting any other inquiry concerning conflicting uses.

After the fact Citigroup conducted searches and studies, but it was apparent that the selection was final, notwithstanding discussions with CIT Group's marketing and advertising persons. The subsequent studies were directed primarily to the manner in which the new name would be introduced and used in promotional material. The inattention and carelessness weigh against Citicorp. *Fisons,* 30 F.3d at 480.

**6.** *Evidence of Actual Confusion:* This factor has been addressed above, and as noted there, the evidence of actual confusion to date is insufficient to establish a pattern of confusion in the market place.

■ **7.** *Marketing and Advertising Non–Competing Goods:* As previously described, CIT Group and Citicorp units engaged in equipment financing and leasing, commercial finance and venture capital in competition with each other and advertised in many of the same trade publications. CIT Group's radio and television advertising is minimal, whereas Citibank engages in radio and television advertising for its consumer bank activities.

In the non-competing areas the evidence does not disclose that CIT Group and Citicorp market and advertise through the same

**790**

channels. The non-competing areas include the immense range of commercial and corporate banking and financing activities of Citicorp in which CIT Group does not and for the most part cannot engage. Much of the marketing in those areas is accomplished through personal contact, and to the extent there is advertising, it likely appears in specialized publications directed to potential customers.

**8. *Similarity of Sales Targets:*** There are many areas in which CIT Group does not compete with Citicorp and thus is not targeting the same customers. This includes all of Citigroup's commercial and corporate banking targets and its fiduciary business targets. CIT Group does not compete with Citgroup in credit finance or business finance. Citicorp does not engage in factoring in competition with CIT Group in the United States and Citicorp does not seek to finance RV, recreational boat or manufactured housing dealers.

To a limited extent CIT Group's and Citicorp's targets are the same in the equipment financing and leasing, venture capital and home equity lending fields. Even in these limited areas, however, the likelihood of confusion is minimal because of the size of the transactions, the lengthy period and preparations required to close the transactions, and the sophistication of the persons involved in the transactions.

**9. *Relationship of Goods:*** In the discrete areas in which CIT Group and Citigroup compete consumers undoubtedly recognize that the two entities are offering similar services, having similar functions. There is nothing to suggest, however, that the association carries over to the wide range of financial services which Citicorp provides which Cit Group does not provide.

**10. *Other Factors:*** CIT advises that it plans to expand its railroad equipment financing into the European and perhaps other overseas markets. It expects to enter the field of automobile financing at the dealer level. For the reasons applicable to similar existing lending operations which CIT Group conducts, these expansions would not change

matters materially and would not make confusion more likely.

■ When all of the above factors are weighed, CIT Group has not established a likelihood of either forward or reverse confusion. The most important factors are: 1) Except in the context of E-mail and the Internet, the names and the manner in which they are presented to the consuming public and to the public at large are sufficiently dissimilar to prevent confusion; and 2) the size and complexity of the transactions, the nature of the security involved, the manner in which customers are solicited or otherwise obtained and the sophistication of the participants are such that customer and potential customer confusion is unlikely.

Citicorp sought to negate the likelihood of confusion, particularly reverse confusion, by means of surveys.

**1. *RL Associates:*** This survey concern concluded that the data it developed and analyzed shows that there was no measurable likelihood of forward confusion and that "there is no legally meaningful likelihood of reverse confusion between Citigroup and The CIT Group."

In a general public study using telephone surveys, 400 consumers were asked (i) whether they were aware of Citigroup and whether they associated it with any other company, or (ii) whether they were aware of The CIT Group and whether they associated it with any other company. Thirteen percent of respondents had heard of Citigroup and were able to correctly identify it; three percent of respondents had heard of The CIT Group and were able to correctly identify it.

In a business study 200 financial decision-makers in companies with $10 million or more in annual sales were asked (i) whether they were aware of Citigroup and whether they associated it with any other company, or (ii) whether they were aware of The CIT Group and whether they associated it with any other company. Thirty-nine percent of respondents had heard of Citigroup and were able to correctly identify it; thirteen percent

of respondents had heard of The CIT Group and were able to correctly identify it.

What is evident from this survey is that even though Citigroup had barely reached the market place, the well known name CITI leads the person being interrogated to associate it with Citicorp and Citibank as a natural connection.

2. ***Shapiro and Associates:*** The Shapiro study reached the conclusion that "there is no significant difference in the amount of confusion which takes place based on the use of the name Citigroup as compared to Citibank. In addition, the levels of confusion which are found, 11% and 10% respectively, are very low. In effect, there is no change or impact on the possibility of confusion occurring when the name Citigroup is substituted for the name Citibank."

This study tested the same business executives CIT regularly studies for testing brand awareness to ascertain whether there would be a likelihood of forward or reverse confusion between (i) Citigroup and The CIT Group, or (ii) Citibank and The CIT Group. The technique used was the so-called "phone-mail-phone" methodology in which the persons to be interviewed were first contacted by phone, then after being screened were sent an express package containing a videotape and sealed envelopes containing exhibits, after which in a call-back they were taken through the videotape and asked questions about the exhibits. It constituted an elaborate attempt to simulate market conditions and test for both forward and reverse confusion.

3. ***Ivan Ross, Ph.D.:*** In his studies, Dr. Ross concluded that there would be no reverse confusion either among consumers or among executives in pertinent industries between The CIT Group and Citigroup, Citicorp, or Citibank. The purpose of the surveys was to determine whether consumers who are aware of the Citigroup mark in the future will, upon encountering The CIT Group name for the first time, associate it with Citigroup. A general public study tested by telephone a nationally representative sample of 200 consumers (all of whom had

sought a home equity or second mortgage loan or to finance an RV, boat, or car in the last five years, or planned to do so in the next two years) to determine whether there would be reverse confusion between The CIT Group and Citigroup (including Citicorp and Citibank). None of the respondents said that they believed The CIT Group was affiliated or connected with any other company that provides financial services to consumers. A business study tested by telephone for reverse confusion among a nationally representative sample of (i) 145 executives responsible for securing financing for companies with $10 million or more in annual sales in industries in which CIT does business, and (ii) intermediaries who advise companies on financing sources. None of the business executives said that The CIT Group was affiliated or associated with Citigroup, Citibank, or Citicorp. Two out of 50 intermediaries (or 4%) said that The CIT Group was affiliated or associated with Citigroup, Citibank, or Citicorp, but neither gave name similarity as a reason.

4. ***Admar Group:*** A consumer confusion study of the Admar Group tested for confusion among a cross-section of 542 consumers of various financial services. Respondents were tested for confusion between The CIT Group name and logo and either (i) the name and logo "Travelers (Red Umbrella Design), A Member of Citigroup" (274 respondents) or (ii) the name and logo "Salomon Smith Barney, A Member of Citigroup (Red Umbrella Design)" (268 respondents). After adjusting for "noise," the study revealed (i) only 3% confusion between The CIT Group and Travelers/Citigroup, and (ii) no confusion between The CIT Group and Salomon Smith Barney/Citigroup.

Another study of the Admar Group tested consumer reactions to company names having the prefix "CITI." On a national basis, many customers of financial services said that they thought a company with the CITI prefix was probably part of or affiliated with Citibank or Citicorp. This was especially true for a company named Citigroup. In metropolitan areas as many as 48 percent of respondents thought a company name "Citi-

group" was probably part of or affiliated with Citibank or Citicorp. No respondent thought that any company with "CITT" prefix was part of or affiliated with The CIT Group. The purpose of that study was not specifically to establish lack of confusion; rather it was designed to show with what entities consumers associated the names including the prefix CITI, i.e., the linkage of names.

CIT Group challenged the individual surveys and it challenged the use of surveys generally in a reverse confusion case. It's expert, Phyllis Welter, criticized the RL Associates survey because: i) its selection of a respondent consumer group was flawed because it included persons who anticipated financing an automobile purchase when CIT Group did not engage in that form of financing, ii) the use of "might" in the question "Do you think you might have ever heard of any other company that *might* be connected with the company" produced answers not probative of the likelihood of confusion, and iii) reverse confusion cannot be measured before the junior user's mark has saturated the market.

Ms. Welter concluded that the Shapiro and Associates survey coded the first 54 questionnaires differently from the way it coded the remainder of the surveys. She asserted that it was an error to ask about a "business" association because "business" does not necessarily indicate a source or origin and was leading. Third, Ms. Welter testified that she never saw the use of positive and negative controls and averaging the results to determine noise (the non-trademark related reasons for indicating likelihood of confusion). After adjusting for the errors she perceived in the survey, Ms. Welter determined that the confusion level between CIT and Citigroup went up 7.6%.

Ms. Welter found that the Admar Group survey was defective because its control used to measure non-trademark related reasons for confusion was defective. The control names (Bankers Trust and Bank of America) had three elements which were not present in the test names.

Professor J. Thomas McCarthy provided a good definition of forward and reverse confusion:

Forward confusion occurs when people who are familiar with the senior user's mark encounter the junior user's mark and because of the similarity of names, or marks, mistakenly think that the junior user's ... services are from the same source as, or are from a source related to, or affiliated with the senior user.

Reverse confusion, on the other hand, occurs when persons who are familiar with the junior user first encounter the senior user and because of the similarity of names or marks mistakenly confuses the goods and services of the two parties.

Reverse confusion typically occurs when the junior user is relatively larger in size and, therefore, able to massively saturate the market with knowledge of the junior user's mark, which then eclipses the recognition value of the senior user.

(Transcript at 625)

The methodology of survey evidence, according to Professor McCarthy, is to create an artificial environment that replicates the real world as closely as possible and in which people can be asked questions about their views and attitudes. This kind of evidence along with other factors, can be an aid to an evaluation of whether there will or will not be a likelihood of confusion.

It is Professor McCarthy's opinion that surveys are not helpful on the issue of confusion in the present case which concerns primarily reverse confusion. In a situation where the junior user (Citigroup) has not yet commenced massive use of its name and there has been no advertising or promotion of products and services under that name reverse confusion cannot be measured because the triggering event of market place saturation has not yet occurred.

While this observation may be generally correct, it is not totally correct in the present case. The overwhelmingly dominant feature of Citicorp's new mark, CITIGROUP, is CITI. That name alone and in combination with other names has saturated the market

for many years without overwhelming The CIT Group name. "Group" is a part of in excess of 2,298 trademarks and service marks in the fields of insurance and financial services which have been registered or for which applications for registration have been filed. The names of nearly 40,000 companies in the financial and insurance fields contain the name "Group".

The Citigroup name joins the many other CITI names, the existence of which creates a saturated market. Thus in the present case the survey evidence may be helpful in determining the likelihood of reverse confusion. It is unnecessary to decide whether it alone would be sufficient, because weighing the other factors led to the conclusion that adoption of the Citigroup name will cause neither forward nor reverse confusion in the market place.

The finding of an absence of either form of confusion defeats CIT Group's claims for trademark infringement (15 U.S.C. § 1114(1)), unfair competition and false designation (15 U.S.C. § 1125(a)(1)), state law unfair competition, and state law trademark infringement (N.J.S.A.56:4–1).

■■■ CIT Group asserts a claim under the federal antidilution statute which provides, in part:

> The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark...

15 U.S.C. § 1125(c)(1)

Factors which a court may consider in determining whether a mark is distinctive and famous include, but are not limited to:

(a) the degree of inherent or acquired distinctiveness of the mark;

(b) the duration and extent of use of the mark in connection with the goods or services with which the mark is used;

(c) the duration and extent of advertising and publicity of the mark;

(d) the geographical extent of the trading area in which the mark is used;

(e) the channels of trade for goods or services with which the mark is used;

(f) the degree of recognition of the mark in the trading areas and channels of trade used by the mark's owner and the person against whom the injunction is sought;

(g) the nature and extent of use of the same or similar marks by third parties; and

(h) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1)

Likelihood of confusion is not an element of a claim under § 1125(c)(1). There are, however, several reasons why CIT Group is not entitled to recover under the antidilution statute.

The famous name in the present case is CITI, whether used alone or as a prefix to other words. These marks have been registered in the Trademark Office. Registration of CITIBANK was obtained in January 1960, and registration of CITICORP use obtained in 1981. CITIGROUP is one more addition to the family of CITI names which, through extensive use and advertising have become internationally famous. CIT Group's first use of the name THE CIT GROUP was not until 1986.

CIT Group is in the anomalous position of urging for the purpose of establishing reverse confusion that it's mark is far less well known than combinations of CITI and therefore will be overwhelmed by CITIGROUP, and for the purpose of establishing dilution that its mark is famous and will be diluted if CITIGROUP appears on the market. These positions are not necessarily inconsistent, but certain of the consideration which bear upon the likelihood of reverse confusion are relevant to dilution issues.

The various factors listed in § 1125(c)(1) were considered in the context of the likeli-

hood of confusion. Consideration of these same factors in a determination of famousness leads to the conclusion that although THE CIT GROUP is distinctive and entitled to trademark protection, it is far from famous. It is employed in only discrete segments of the financial services industry; only recently has its advertising resulted in any degree of name recognition; the surveys disclosed that even now the name is not well known among consumers and for the most part recognition is limited to principal players in the market in which it is active. This is insufficient to qualify the mark as famous, *Michael Caruso & Co. v. Estefan Enter. Inc.*, 994 F.Supp. 1454 (S.D.Fla.1998); *Genovese Drug Stores, Inc. v. TGC Stores, Inc.*, 939 F.Supp. 340 (D.N.J.1996).

Further, there is no likelihood that use of the CITIGROUP mark will cause dilution of THE CIT GROUP mark. Section 1125(c)(1) "applies when use of a mark by a party other than the mark's owner has the effect of destroying the public's perception that the mark signifies something unique, singular, or particular." McCarthy at App. A5, p. A5–11.

A number of the factors which entered into the reverse confusion determination bear upon the determination of blurring. As discussed above for many reasons the public will be unlikely to associate THE CIT GROUP with CITIGROUP and vice versa. This was established by the nature of the market in which the two entities are engaged and it was further established by the surveys.

CIT Group has not established a dilution claim under federal law. Because the standard for dilution under the Lanham Act and N.J.S.A. 56:3–13.20 are similar, see *Jews for Jesus v. Brodsky*, 993 F.Supp. 282, 310 (D.N.J.1998), it fails to state a claim under the New Jersey dilution statute even if CIT Group could rely on that statute in this case, see 15 U.S.C. § 1125(c)(3).

### Conclusion

For the reasons set forth above CIT Group has failed to establish its claim under either federal or state law. Consequently its demand for injunctive relief will be denied and the action dismissed.

In the discussion of likelihood of confusion it was noted that by virtue of the constraints and technical requirements of the Internet system there is a likelihood of confusion on the Internet if Citicorp adopted the domain name www.citigroup.com. Citicorp has not adopted a domain name, and is litigating the right of another entity to use www.citigroup.com. The dismissal of the action will be without prejudice to CIT Group's right to apply in this action or otherwise for relief in the event that Citicorp's selection of a name or names for use on the Internet or related services causes confusion or is likely to cause confusion with www.citgroup.com.

As of June 30, 1998
Dollars in Billions

# THE CIT GROUP, INC.

COMMERCIAL — CONSUMER

PLAINTIFF'S EXHIBIT
66
ALL-STATE LEGAL®

| | EQUIPMENT FINANCING and Leasing | Factoring | Commercial FINANCE | VENTURE CAPITAL | Home Equity Lending | Sales Financing |
|---|---|---|---|---|---|---|
| **Strategic Business Units** | Equipment Financing and Capital Finance | Commercial Services | Business Credit and Credit Finance | Equity Investments | Consumer Finance | Sales Financing |
| **Total managed assets** | Equipment Financing $8.3, Capital Finance $3.7 | $2.3 | Business Credit $1.4, Credit Finance $1.0 | $0.76 | $2.6 | $4.3 |
| **Industries/Markets** | Commercial Aircraft, Containers, Rail, Construction, Business aircraft, Machine tools, Transportation, Manufacturing, Containers, Graphic Arts, Data Processing, Plastics, Mining, Telecommunications, Materials handling, Franchising, Inland Marine, Medical, Automotive, Chemicals, Paper & Pulp | Apparel, Textiles, Furniture, Home furnishings, Frozen foods, Housewares, Carpet, Footwear, Consumer Electronics | Retail, Manufacturing, Electronics/Technology, Chemicals | Manufacturing, Service Businesses, Technology Development | Consumer home equity | Recreation vehicles, Manufactured housing, Recreational boats |
| **Products** | Direct secured loans and leases secured by: Retail/wholesale secured financing for dealers/manufacturers, Secured revolving lines of credit, Syndications/participations, Operating leases, Private label financing | Factoring, Import and export financing, Letters of credit, Revolving lines of credit and term loans, Credit protection and accounts receivable collection | Revolving lines of credit and term loans secured by: • Accounts receivable • Inventories • Fixed assets; Acquisition/expansion financing, Debtor-in-possession financing, Syndications/participations | Private Equity for Buyouts/Recapitalizations, Growth/Expansion/Early Stage | Home equity closed end loans, Home equity lines of credit | Retail sales financing • Recreation vehicles • Manufactured housing • Recreational boats; Wholesale inventory financing, Loan portfolio servicing, Private label financing |
| **Origination** | Direct, Intermediaries, Dealers and Distributors, Manufacturers, Portfolio purchases | Direct, Intermediaries, Referrals | Direct, Intermediaries, Referrals | Direct, Intermediaries, Referrals | Direct, Brokers, Wholesale correspondent, Portfolio purchases | Direct, Dealers, Portfolio purchases |
| **offices** | offices: 31 Equipment Financing, 3 Capital Finance; residence offices: 97 Equipment Financing | 7 offices | offices: 7 Business Credit, 15 Credit Finance | 1 office | 35 offices; 6 residence offices | 7 offices; 39 residence offices |

APPENDIX B

**THE CIT GROUP**

**Reg. No. 1,448,848**
Registered July 21, 1987

**Reg. No. 1,452,503**
Registered Aug. 11, 1987

**734,707**
Registered July 17, 1962

CIT

**Reg. No. 1,000,360**
Registered Dec. 24, 1974

**Reg. No. 1,113,307**
Registered Feb. 13, 1979

## APPENDIX  C

PLAINTIFF'S EXHIBIT 40

ALL-STATE LEGAL®

