**CITIGROUP INC. and CITICORP., Plaintiffs,**

v.

**CITY HOLDING COMPANY and City National Bank Of West Virginia, Defendants.**

**No. 99 CIV. 10115(RWS).**

United States District Court, S.D. New York.

Oct. 30, 2001.

---

**9.** *Schechter,* 17 F.Supp.2d at 260 (citing *Karriem v. Amer. Kennel Club,* 949 F.Supp. 220, 221 (S.D.N.Y.1996)).

**10.** *See* 28 U.S.C. § 1391.

See, also, 97 F.Supp.2d 549.

Skadden, Arps, Slate, Meagher & Flom by Kenneth A. Plevan, Esq., Stephanie J. Kamerow, Esq., New York City, for Plaintiffs.

Baker Botts by Russell H. Falconer, Esq., Steven R. Gustavson, Esq., New York City, for Defendants.

## OPINION

SWEET, District Judge.

Plaintiffs Citigroup Inc. and Citicorp (collectively "Citicorp"), have moved for summary judgment under Rule 56, Fed. R.Civ.P. on their affirmative claims of trademark infringement, dilution and unfair competition and to dismiss the counterclaims of defendants City Holding Company ("City Holding") and City National Bank of West Virginia ("City National") (collectively "City Holding") which assert similar claims against Citicorp.

For the reasons set forth below, the Citicorp motion for judgment on its claims is denied, its federal and New York dilution claims are dismissed, and its motion to dismiss the counterclaims of City Holding and City National is granted.

### Underlying Issue

This action presents the contest between aurally identical marks employed by one of the primary financial institutions in the nation and by a West Virginia bank that has had regional and national aspirations. Competing causes of action for trademark infringement, dilution and unfair competition have been presented.

The resolution of these issues turns upon the effect of I/Y distinction between CITI and CITY, the significance of the feud between two families of marks, and the significance of the size of the marks. These issues will be resolved in the usual context of the factors established by our circuit in *Polaroid Corp. v. Polarad Elec-*

*tronics Corp.*, 287 F.2d 492 (2d Cir.1961) (*"Polaroid"*).

Able counsel for both sides have carefully illuminated the issues and substantially assisted the court.

### Prior Proceedings

Parallel actions were commenced in 1999. Citicorp filed its complaint in this Court in New York on September 29, 1999, and City Holding filed its action in the United States District Court for the Southern District of West Virginia, Charleston Division, on November 5, 1999. This Court in an opinion of June 2, 2000 (the "Opinion"), *Citigroup Inc. v. City Holding Company*, 97 F.Supp.2d 549 (S.D.N.Y. 2000), denied City Holding's motion to dismiss for lack of jurisdiction and its motion to transfer the action to the West Virginia District Court and enjoined City Holding from prosecuting its action there. Familiarity with the Opinion is presumed.

Discovery proceeded without difficulty and the instant motion was heard and marked fully submitted on June 27, 2001.

### FACTS

### The Establishment of the Marks

The facts are found based upon the Local Rule 56.1 Statements of the parties with inferences drawn in favor of City Holding, the non-moving party.[1]

On January 19, 1960, Citibank, a predecessor of Citicorp and Citigroup, registered the mark CITIBANK with the United States Patent and Trademark Office ("PTO"). Citicorp federally registered THE CITI NEVER SLEEPS shortly after February 1978.

---

1. Citicorp have made a Submission Combining Each party's Contentions Under Rule 56 With Opposing Party's Responses. City Holding moved to strike the submission as unauthorized by Local Rule 56.1 or Rule 56.

Since no additional facts are set forth, the motion to strike will be denied and the submission treated as an addendum to the Plaintiffs' Reply Memorandum.

As of December 31, 1980, Citicorp had federally registered the following marks: CITIBANK, CITICARD, CITICORP, CITIDATE, CITIPHONE, CITIPLAN, CITIQUOTE, CITISHARE and THE CITI NEVER SLEEPS, as well as 19 others. Citicorp federally registered the mark CITI on December 8, 1981.

By the end of 1985, there were approximately 60 federally registered CITI-prefixed marks. These included the following marks not registered as of December 31, 1980: CITI, CITI TREASURY MANAGER, CITI$HOPPER, CITIDOLLARS, CITIFILE, CITIFLEX, CITILEASE, CITISAVINGS, and CITITREND. By December 31, 1990, CITI's family of approximately 60 registered marks also included the following: CITIBANK PREFERRED, CITICORP TRAVELERS CHECKS, CITIEXPRESS, CITISPAN and CITISTAR. As of year-end 2000, there were approximately 140 marks either registered or covered in a pending federal trademark application in the CITI family of marks.

Citicorp has used slogans featuring the CITI mark, including "The CITI Never Sleeps" (1978), "The CITI of Tomorrow" (1981), "The CITI at Your Front Door" (1981), "It's your CITI" (1984), and "The CITI of Your Dreams" (1995). The CITI mark is also used in vanity phone numbers, including 1–800–321–CITI, 1–800–441–CITI, 1–800–336–CITI, 1–800–328–CITI, 1–800–967–CITI, 1–800–835–CITI, and 1–800–CITIGOLD. The number 1–800–CITI–ATM was used in the 1980's.

In November and December of 1998, focus group testing was done for Citicorp in Ohio, Texas and South Carolina in order to assess the public's reaction to proposed names to replace the Commercial Credit Corporation, a consumer finance subsidiary that had been a Travelers company. The survey company concluded that of the six names tested, CITIFINANCE and CITIFINANCIAL held the greatest potential.

A search report was ordered on December 22, 1998, with respect to CITIFINANCE/CITIFINANCIAL which revealed City Holding's CITI FINANCIAL CORP and CITY FINANCIAL CENTER marks, along with 18 pages of listings of "City Finance" companies. Both names were cleared. On January 15, 1999, Citibank filed an application to register the CITIFINANCIAL mark, stating under oath that there were no other parties with the right to use that mark.

On January 15, 1999, Citibank filed an application to register the CITIFINANCIAL mark, attesting that there were no other parties with the right to use that mark.

On April 3, 2000, the name of the Citicorp Mortgage, Inc. subsidiary was changed to CITIMORTGAGE.

City National Bank of Charleston was chartered in West Virginia in 1957 and used the CITY NATIONAL BANK mark throughout the 1960's, '70's and '80's. City Holding Company became the bank's corporate parent in 1983, after which substantial in-state expansion was effected through the acquisition of other banks, and by the building of City National Banks, between 1983 and 1997, with almost 60 branches.

In 1993, City Bank adopted the mark CITY FINANCIAL CORP, followed later that year by CITY MORTGAGE CORP. In 1996 CITY MORTGAGE SERVICES used the CITY HOME LENDING and CITY LENDING SERVICES names in the late 1990's.

In the mid 1990's, City Holding began to develop a nationwide mortgage service and origination business. In July 1996, City National established a "City Mortgage

Services" division in California. This was followed by the acquisition of several West Coast banks and mortgage companies, and the establishment of a mortgage office in Dallas.

Beginning in July 1997, City Holding filed federal trademark applications for the following eight CITY marks: CITY CREDIT SERVICES; CITY FINANCIAL CORP; CITY HOLDING COMPANY; CITY MORTGAGE CORP; CITY MORTGAGE SERVICES; CITY NATIONAL BANK; CITY CAPITAL RESOURCES; and CITY FINANCIAL CENTER. In each of these applications, City Holding disclaimed any rights with respect to the non-CITY component of the marks.

### Use and Effect of the Marks

In the late 1960's and early 1970's, Citicorp established Citicorp Venture Capital and Citicorp Leasing, two financial service businesses that operated nationally. In 1979, Citicorp founded Citicorp Mortgage, headquartered in St. Louis, Missouri, and by the late 1980's Citicorp Mortgage was one of the country's top issuers of new first mortgages. Other Citicorp businesses with offices or customers across the country included Citicorp Industrial Credit Corp., Citicorp Capital Investors Ltd., and Citicorp Business Credit, Inc. As of 1984, for example, approximately 11.7 million domestic households, or one out of every seven, was a Citicorp/Citibank customer. Citicorp had business relations with more than 17 million domestic households.

During the 1970's, Citicorp became the largest United States banking corporation in terms of loans and the largest nongovernmental bank worldwide with 850 offices in close to 90 countries. By 1972 Citicorp's assets exceeded $30 billion.

In 1984, Citibank and Citicorp had customers in every one of the 50 states, and relationships with 11.7 million domestic households, or one out of every seven households in the country. In 1990, Citicorp had business relationships with more than 17 million domestic households, and by 1997, Citicorp had customers in over 22 million U.S. households.

Advertising and marketing expenditures in the U.S. of Citibank products for the years 1994–2000 were as follows:

| 1994 | $ 381 million |
|---|---|
| 1995 | $ 394 million |
| 1996 | $ 331 million |
| 1997 | $ 353 million |
| 1998 | $ 660 million |
| 1999 | $ 715 million |
| 2000 | $ 603 million |

During the years 1974–84, Citicorp spent over $100 million on advertising CITI brand services throughout the United States.

Citicorp's revenue has been as follows:

| 1980 | $ 3.7 billion |
|---|---|
| 1985 | $ 8.5 billion |
| 1990 | $ 14.6 billion |
| 1995 | $ 18.7 billion |
| 1997 | $ 21.6 billion |

In terms of consumers, the approximate number of U.S. households which utilized Citicorp services in selected years was as follows:

| | Total | Credit Card | Retail [2] |
|---|---|---|---|
| 1980 | 4.3 million | 3.6 million | 645,430 |
| 1985 | 8.9 million | 7.7 million | 980,497 |
| 1990 | 17.5 million | 15.5 million | 1.7 million |
| 1995 | 20.5 million | 18.2 million | 1.6 million |
| 1997 | 22.8 million | 20.1 million | 1.9 million |

As shown by a 1996 Corporate Image Study, 89% of U.S. consumers have heard of Citibank. The same study shows that 51% of the public is familiar with the services provided by Citibank.

Citigroup has received extensive unsolicited media coverage for decades, including

2. Includes mortgages.

hundreds of articles appearing in mass circulation, newspapers, magazines and electronic media, including national publications as *The New York Times,* the *Wall Street Journal, Fortune* and *Forbes,* some of which news stories have referred to Citigroup and/or its predecessors as simply "CITI."

As part of its nationwide business activities, Citibank has offered financial services in West Virginia since at least 1980.

As of 1980, approximately 6,800 households in West Virginia had a Citibank credit card. In 2000, the number of West Virginia Citicorp credit card holders exceeded 116,000.

Citicorp Travelers Checks, sold nationwide, were also sold in West Virginia.

Citicorp has offered mortgages to West Virginia households since at least 1980.

In 1990, Citicorp Mortgage originated 29 mortgages in West Virginia totaling $2.4 million, and as of December 31, 1990, Citicorp Mortgage was servicing 145 loans in West Virginia totaling $9 million and in 2000 CitiMortgage originated 195 loans in West Virginia totaling $16 million, and as of December 31, 2000, CitiMortgage was servicing 1,800 loans in West Virginia totaling $127 million.

In 1990 or 1991, City Holding retained a public relations firm to recommend a new logo for City Holding. The new logo enlarged the word "CITY" compared to the words "Holding Company."

City National began using the following format for the presentation of its mark which placed the word "City" directly above "National Bank" in a larger, distinct typeface.

During this period there were three bank locations in West Virginia operating under the City National Bank name.

During the period 1990–97, City Holding continued to acquire community banks in West Virginia, operating most of them under their pre-acquisition names.

In October 1993, defendants formed City Financial Corporation to market securities brokerage and investment advisory services.

In 1998, following an acquisition of a West Virginia based community bank which doubled the size of City National, City Holding changed the name of "City National Bank of Charleston" to "City National Bank of West Virginia" and consolidated all of its community banks into the City National subsidiary under the CITY National Bank name and logo.

As of September 2000, City Financial Corp. had 8 employees, approximately 1,400 customers, 90% of which resided in West Virginia and 80–85% of which were also customers of City National Bank, and operated out of office space allocated to that business in 3–4 City National Bank locations in West Virginia.

In 2000, City Financial Corp. had revenues of approximately $525,000 and profits of $29,000. Advertising and marketing expenses for the three years 1998–2000 never exceeded $12,000 per year.

In December 1996, City Holding acquired certain assets and liabilities of Prime Financial Corporation, a mortgage loan servicing company located in Costa Mesa, California. Prime Financial's assets were then integrated into City Mortgage Services.

In October 1997, City Holding acquired First Allegiance Financial Corporation, a mortgage company headquartered in Irvine, California and established an office of City Mortgage Services in Dallas, Texas, conducted under the name City Home Lending.

In 1998, City Holding acquired a federally chartered savings bank, Del Amo Savings Bank, located in Torrance California, and Frontier State Bank, headquartered in Redonda Beach, California.

During the years 1998–2000, City Holding sent out over 20 million of direct mail solicitations to households throughout the United States for a "125" mortgage product (*i.e.*, a second mortgage which had a loan value up to 125% of the value of the mortgaged property) and in these solicitations, defendants utilized marks and logos including the "City National Bank" logo described above, that displayed the word "City" prominently in a larger typeface. Among the others used were "City Home Lending", "City Mortgage Services", and "City Lending Services", in all of which the word "City" was predominant.

Subsequently, City Holding announced losses in connection with a whole loan purchasing program in May 1998, wrote off a $10 million investment in Mego Mortgage Corporation in 1999, and at the end of 1999, City Holding took write-offs of more than $9 million to cover losses on securitization transactions.

By March 2000, City Holding announced that it would exit the "Specialty Finance" (or "high loan to value") business entirely and drastically scale back its mortgage origination business and on January 31, 2001, City Holding announced the complete shut-down of the mortgage origination business, the sale of the West Coast banks, a cancellation of a quarterly dividend, and fourth quarter write-downs of more than $40 million.

### Protection of the Marks

During the 1970's and 1980's, initially as FIRST NATIONAL CITY BANK, and then as CITIBANK, Citibank brought thirty-five lawsuits involving usages of either the CITI spelling or phonetical twins such as "City Bank."

Citibank did not take action against entities that used the formulation "City National Bank." In litigation against First City Bancorporation of Texas, the Settlement Agreement required only that the Texas company refrain from using "City Bank," and stated that "City National Bank" and "First City National Bank" were acceptable, non-infringing uses "throughout the world ... in connection with all business, goods and services." Other settlements included forcing a business publication to change its name from CITIBUSINESS to CityBusiness, and forcing a Citi Mortgage Co. in Georgia to change its name to City Mortgage Co.

In 1990, Citibank requested Citi Mortgage Associates of Pennsylvania to change its name to CITY MORTGAGE ASSOCIATES. The Pennsylvania company complied and adopted a logo, which it sent Citibank to verify its compliance with the settlement.

Enforcement of CITI marks included negotiations in 1994 in which Citimortgage Corp. of Washington State agreed to change its name to City Mortgage Corp., and a Patent Office opposition proceeding in 1997, in which the owner of CITI HABITATS, used on real estate financial services, settled the proceeding by changing its name to CITY HABITATS.

A search report conducted in September 1997 was reviewed by Citicorp for clearance purposes for the mark CITIFUND, to be used on mutual funds and revealed a variety of marks including City Holding's CITY FINANCIAL CENTER and CITY FINANCIAL CORP applications.

In early 1998, Citibank considered opposition proceedings against the owner of an intent-to-use trademark application for CITISAFE covering safes to protect against the CITI usage.

In April or May of 1998, Citibank personnel obtained a copy of City Holdings' solicitation for home equity loans on which CITY NATIONAL BANK logo was prominently used as well as CITY MORTGAGE SERVICES advertising materials. The advertisements indicated that the company was located in Charleston, West Virginia.

In *CIT Group, Inc. v. Citicorp*, 20 F.Supp.2d 775, 784 (D.N.J.1998), Citicorp successfully argued that CITIGROUP and THE CIT GROUP should be deemed dissimilar, notwithstanding massive and widespread use of their marks by both parties in the financial services marketplace.

In the spring of 1998, Citicorp and the Travelers Group agreed to merge. In a desire to incorporate elements of both names, the Citicorp board of directors suggested the umbrella name "Citigroup." In 1998, in the wake of the merger, Citigroup used the CITI mark to name all of the divisions and flagship products, while prior to the merger, Citibank rather than Citi was the first level of branding emphasis.

On January 22, 1999, the General Counsel for the Aristar Company, headquartered in Tampa, Florida wrote to the General Counsel of Citigroup's Commercial Credit subsidiary, attaching a news article he had seen which reported that Citigroup was considering changing the Commercial Credit name to CITIFINANCE. Aristar protested on the basis that Aristar's "City Finance subsidiary currently uses the mark CITY FINANCE at approximately 100 locations ... in 22 states ... The CITY FINANCE mark has been in use in commerce continuously since 1945 at retail locations throughout the southern United States."

In reply to Aristar, counsel to Citibank wrote: "As I am sure you know, business names comprised of combinations of 'City' and 'Finance' or 'financial' are common in the financial industry ... we do not believe that our use of 'CitiFinance' or a similar name ... will violate any rights." Later in September, plaintiff reiterated that:

[a]s you know, business names comprised of variations of "City" and "Finance," "Financial," "Loan," "Credit," and similar phrases are common in the financial industry. For example, Commercial Credit's Ohio subsidiary operates over 100 offices in Ohio under the name "City Loan Financial" and has used the "City" name since 1912 ... CitiFinancial is a single word, as opposed to two words, and thus creates a very difference [sic] commercial impression than does "City Finance." Further, the emphasis is on the famous "Citi" portion of the mark, which assures that it will be understood by the public as a member of the famous "Citi" family and not with your company.

The companies reached a commercial settlement.

In February, March and April of 1999, a series of requests to extend the time to oppose City Holding Company's federal trademark applications to register CITY MORTGAGE SERVICES and CITY MORTGAGE CORP were filed in the Patent and Trademark Office by Citigroup. However, no opposition was ultimately filed.

On October 20, 1999, counsel to Citicorp sought permission to reserve in Ohio the CitiMortgage, Inc. corporate name, and arguing that no conflict existed with an existing reservation of name of "City Mortgage Company", said:

[T]he public will understand that Citimortgage, Inc. is associated with and part of the Citigroup family. Additionally, because "City" is a commonly used prefix for financial services corporations, Citigroup and its many subdivisions that

bear the famous CITI prefix have coexisted with many "City" entities for years in virtually every jurisdiction.

In May 1999, representatives of Citicorp met to discuss City Holding's marks. In September 1999, Citibank's commercial credit branches in West Virginia changed their name to CITIFINANCIAL, and City Holding wrote to Citibank suggesting a meeting to discuss the issue thus presented. This lawsuit was filed the following day.

In October 1999, after this suit had been filed, Citibank sought consent from City Holding Company to Citibank's reservation of the name CITIMORTGAGE, INC. with the West Virginia Secretary of State.

### Present Third–Party Uses of City

Citigroup's Senior Trademark Counsel, "generally tr[ies] to stay on top of other uses of C–I–T–Y and C–I–T–I prefixed marked in the financial services area[,]" and, although she does not know exactly how many are out there, estimated that there would be closer to 100 than only several. In her six years, she has never encountered anybody alleging that there has been consumer confusion between plaintiffs' Citi-marks and anybody else's "City" mark.

The following marks use a City designation in connection with financial services and have not been the subject of enforcement proceedings by Citibank:

| ENTITY | MARK | REG.NO. | LOCALE | TOTAL ASSETS |
|---|---|---|---|---|
| CAPITAL CITY BANK | CAPITAL CITY BANK and Design | 2,007,889 | FLORIDA | 1,375,567 |
| CITY BANK | CITYBANK | | WASHINGTON | 525,035 |
| CITY BANK | CITYBANK | | HAWAII | 895,684 |
| CITY BANK & TRUST | CITY BANK & TRUST and Design | | LOUISIANA | 148,738 |
| CITY FEDERAL FUNDING & MORTGAGE CORP. | CITY FEDERAL | 1,998,210 | MARYLAND | |
| CITY FEDERAL FUNDING & MORTGAGE CORP. | CITY FEDERAL FUNDING and Design | 1,999,547 | MARYLAND | |
| CITY FIRST BANK OF DC | CITY FIRST BANK OF DC | | DISTRICT OF COLUMBIA | 27,513 |
| ONE VALLEY BANCORP OF W. VA. | CITY NATIONAL BANK OF FAIRMONT | 2,023,268 | WEST VIRGINIA | |
| CITY NATIONAL BANK OF FLORIDA | CITY NATIONAL BANK OF FLORIDA and Design | | FLORIDA | 1,802,714 |
| CITY NATIONAL BANK | CITY NATIONAL BANK and Design | | CALIFORNIA | 8,647,277 |
| CITY NATIONAL BANK | CITY NATIONAL BANK | | NEW YORK | 331,247 |

| | | | |
|---|---|---|---|
| CITY NATIONAL BANK | CITY NATIONAL BANK and Design | | TEXAS | 124,526 |
| CITY NATIONAL BANK & TRUST | CITY NATIONAL BANK & TRUST and Design | | NEBRASKA | 192,222 |
| CITY NATIONAL BANK OF GREELEY | CITY NATIONAL BANK and Design | | NEBRASKA | 17,410 |
| CITY STATE BANK | CITY STATE BANK and Design | | IOWA | 83,526 |
| CITY STATE BANK | CITY STATE BANK and Design | | TENNESSEE | 103,966 |
| CITY & SUBURBAN SAVINGS BANK | CITY & SUBURBAN FEDERAL SAVINGS BANK and Design | 2,225,1113 | NEW YORK | 427,054 |
| FIRST CITY BANCORPORATION OF TEXAS | FIRST CITY | 1,275,482 | TEXAS | |
| FIRST CITY BANCORPORATION OF TEXAS | FIRST CITY, TEXAS | 1,534,637 | TEXAS | |
| FIRST CITY BANK OF OF FLORIDA, INC. CORP. | FIRST CITY BANK & Design | 2,431,096 | FLORIDA | 168,816 |
| GOLDEN CITY COMMERCIAL BANK CORP. | GOLDEN CITY COMMERCIAL BANK | 1,6512,011 | NEW YORK | |
| HASTINGS CITY BANK | HASTINGS CITY BANK and Design | | MICHIGAN | 203,544 |
| LAKE CITY BANK | LAKE CITY BANK and Design | | INDIANA | 1,082,616 |
| LEAGUE CITY BANK & TRUST | LEAGUE CITY BANK & TRUST and Design | | TEXAS | 106,631 |
| MIDCITY FINANCIAL CORP | MIDCITY FINANCIAL CORPORATION | 2,072,382 | ILLINOIS | 941,603 |
| MIDCITY FINANCIAL CORP | THE MID–CITY NATIONAL BANK | 1,965,553 | ILLINOIS | 941,603 |
| NATIONAL CITY CORPORATION | NATCITY | 2,058,052 | REGIONAL | 33,219,812 |
| NATIONAL CITY CORPORATION | NATIONAL CITY | 1,904,621 | REGIONAL | 33,219,812 |
| NATIONAL CITY CORPORATION | NATIONAL CITY COMPLETE LOAN | 2,136,298 | REGIONAL | 33,219,812 |
| NATIONAL CITY CORPORATION | NATIONAL CITY CORPORATION | 1,913,729 | REGIONAL | 33,219,812 |

| | | | | |
|---|---|---|---|---|
| NATIONAL CITY CORPORATION | NATIONAL CITY CORPORATE SELECT | 2,184,859 | REGIONAL | 33,219,812 |
| NATIONAL CITY CORPORATION | NATIONAL CITY INVESTMENT MANAGEMENT COMPANY | 2,317,245 | REGIONAL | 33,219,812 |
| NATIONAL CITY CORPORATION | NATIONAL CITY LEASING CORPORATION | 1,761,676 | REGIONAL | 33,219,812 |
| NATIONAL CITY CORPORATION | NATIONAL CITY MONEY CARD | 1,960,920 | REGIONAL | 33,219,812 |
| NATIONAL CITY BANK OF MINNEAPOLIS | NATIONAL CITY BANK OF MINNEAPOLIA | | MINNESOTA | 887,989 |
| QUAD CITY BANK & TRUST | QUAD CITY BANK & TRUST and Design | | IOWA/ ILLINOIS | 361,960 |
| QUAKER CITY BANK | QUAKER CITY BANK | | CALIFORNIA | 1,199,516 |

No direct evidence of actual confusion between the marks at issue has been presented.

## CONCLUSIONS

### Summary Judgment is Appropriate

Rule 56(c) of the Federal Rules of Civil Procedure provides that a motion for summary judgment may be granted when "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The Second Circuit has repeatedly noted that "as a general rule, all ambiguities and inferences to be drawn from the underlying facts should be resolved in favor of the party opposing the motion, and all doubts as to the existence of a genuine issue for trial should be resolved against the moving party." *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (Brennan, J., dissenting)); *see Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 (2d Cir.1995); *Burrell v. City Univ.*, 894 F.Supp. 750, 757 (S.D.N.Y.1995). If, when viewing the evidence produced in the light most favorable to the non-movant, there is no genuine issue of material fact, then the entry of summary judgment is appropriate. *See Burrell*, 894 F.Supp. at 758 (*citing Binder v. Long Island Lighting Co.*, 933 F.2d 187, 191 (2d Cir.1991)).

Materiality is defined by the governing substantive law. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment." *Quarles v. General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985).

For a dispute to be genuine, there must be more than "metaphysical doubt." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505 (citations omitted).

Summary judgment is employed in trademark infringement cases. *See, e.g., Lois Sportswear, U.S.A. Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 876 (2d Cir. 1986) (summary judgment for plaintiff in trademark infringement and unfair competition case); *Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, No. 99 CIV 10175 JSM, 2001 WL 170672, at *14 (S.D.N.Y. Feb. 21, 2001) trademark claims; *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 15 F.Supp.2d 389, 400 (S.D.N.Y.1998) (same), *aff'd on other grounds*, 192 F.3d 337 (2d Cir.1999); *Consolidated Cigar Corp. v. Monte Cristi de Tabacos*, 58 F.Supp.2d 188, 200 (S.D.N.Y. 1999) (same); *Nabisco, Inc. v. Warner–Lambert Company*, 220 F.3d 43 (affirming summary judgment for defendant in trademark infringement and unfair competition case); *Cosmetically Sealed Industries, Inc. v. Chesebrough–Pond's USA Co.*, 125 F.3d 28 (2d Cir.1997) (same).

Summary judgment in a trademark action may be appropriate in certain circumstances, where the undisputed evidence would lead only to one conclusion as to whether confusion is likely. *See, e.g., Lang v. Retirement Living Publishing Co., Inc.*, 949 F.2d 576, 582 (2d Cir.1991); *Lois Sportswear, USA, Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 876; *see also Murphy v. Provident Mutual Life Ins. Co.*, 923 F.2d 923, 930 (2d Cir.1990), *cert. denied*, 502 U.S. 814, 112 S.Ct. 65, 116 L.Ed.2d 40 (1991); *Universal City Studios, Inc. v. Nintendo Co., Ltd.*, 746 F.2d 112, 115 (2d Cir.1984).

### Summary Judgement is Denied as to Citigroup's Trademark Infringement Claims

Trademark infringement claims require a showing that: (1) the CITI family is comprised of valid marks entitled to pro-

tection under the Lanham Act; (2) defendants' use of their family of CITY marks was subsequent to the creation of plaintiffs' CITI marks; and (3) defendants' use of its CITY family of marks is likely to cause confusion with plaintiffs' family of CITI marks. *See Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 137–38 (2d Cir.1999); 15 U.S.C. §§ 1114(1), 1125(a)(1)(A). *See also Chauvin Int'l Ltd. v. Goldwitz*, 927 F.Supp. 40, 48 (D.Conn.1996) (granting summary judgment), *aff'd mem. sub nom. B.U.M. Int'l Inc. v. Goldwitz*, 113 F.3d 1229, 1997 WL 279999 (2d Cir.1997).

In the Second Circuit, courts consider the *Polaroid* factors as a framework for evaluating whether there is a likelihood of confusion. *See Polaroid Corp. v. Polarad Elec. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). The factors to be considered here are the strength of the family of CITI marks, the degree of similarity between the CITI and CITY marks, the proximity of services, the likelihood that Citigroup will "bridge the gap", evidence of actual confusion, defendants' bad faith, the sophistication of customers and the quality of services. These eight factors are not exhaustive, nor is any single factor dispositive, *see Nikon Inc. v. Ikon Corp.*, 987 F.2d 91, 94 (2d Cir.1993). "[T]he evaluation of the Polaroid factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused," *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 584 (2d Cir.1993) (internal quotation marks and citation omitted).

### I. The I/Y Distinction is Critical

Plaintiffs contend that an evaluation of the *Polaroid* factors establishes a likelihood of confusion based on defendants' use

of their CITY marks. However, the I/Y distinction is critical, though the marks are aurally identical.

The CITI prefix is a strong and distinct mark. The "strength" of a mark is a measure of a mark's distinctiveness, *i.e.*, the mark's "tendency to identify the goods [or services] sold under the mark as emanating from a particular, although possibly anonymous, source." *See Sports Auth., Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 960 (2d Cir.1996) (citation omitted) (alteration in original).

The Honorable Pierre N. Leval of our circuit recently formulated the significance of distinctiveness as follows:

> The inherent distinctive quality of a mark has long been an important standard in trademark law. The law has always disfavored marks that lack distinctiveness and either denied them protection outright or grudgingly granted protection under special conditions. Distinctiveness is traditionally measured on a scale memorably described by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir.1976). The scale, progression from least to most distinctive, is described in terms of marks that are: (1) generic; (2) descriptive; (3) suggestive; and (4) arbitrary or fanciful. Judge Friendly noted that the ascending order reflected not only "eligibility to trademark status," but also the degree of protection accorded. *Id.* at 9.

\*      \*      \*      \*      \*      \*

Marks that do not directly describe goods or services or their attributes, but rather are suggestive of them, have some distinctive quality and are thus protected without need to prove secondary meaning. *See Abercrombie*, 537 F.2d at 10–11; *Nabisco*, 191 F.3d at 215–16. The most distinctive marks, and thus the strongest, are marks that are arbitrary or fanciful. Arbitrary or fanciful marks enjoy the broadest protection of the trademark laws. *See Abercrombie*, 537 F.2d at 11; *Nabisco*, 191 F.3d at 216.

244 F.3d 88, 93; *TCPIP Holding Co. v. Haar Communications Inc.*, 244 F.3d 88, 93–94 (2d Cir.2001).

Therefore, the inquiry into the strength of a mark focuses on two factors: (i) the mark's *inherent* distinctiveness (*i.e.*, whether it is generic, descriptive, suggestive, arbitrary, or fanciful), and (ii) its acquired distinctiveness (strength) in the marketplace. *See Time, Inc. v. Petersen Publ'g Co.*, 173 F.3d 113, 118 (2d Cir.1999); *General Cigar Co. v. G.D.M. Inc.*, 988 F.Supp. 647, 663 (S.D.N.Y.1997). In addition, registered trademarks that have become incontestable enjoy a conclusive presumption of distinctiveness. *See* 15 U.S.C. §§ 1065, 1115(b); *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 192–93, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985).

Suggestive marks offer suggestions of product qualities, but do not actually describe the features of a product or service. *See Hasbro, Inc. v. Lanard Toys, Ltd.*, 858 F.2d 70, 73 (2d Cir.1988) (finding GUNG–HO mark suggestive for action figure); *BIC Corps. v. Far E. Source Corp.*, No. 99 CIV 11385 HB, 2000 WL 1855116, at \*3 (S.D.N.Y. Dec. 19, 2000) (finding WITE–OUT suggestive for correction products). A suggestive mark requires "imagination, thought and perception to reach a conclusion as to the nature of the goods." *See Hasbro, Inc.*, 858 F.2d at 73 (citation omitted). Suggestive marks are considered strong marks. *Id.* at 73, 75, 77.

■ CITI (registered in 1981) is a coined term, not appearing in the dictionary. It does not describe banking or financial services, or any features or quali-

ties of financial services and the term CITI is not in any way geographically descriptive because the business of Citicorp is national and international in scope.

Several courts addressing this issue have confirmed that the CITI marks are, at a minimum, suggestive. In *Citicorp v. Soro*, No. 85–2960–CIV (S.D.Fla. Oct. 7, 1988), Citicorp sued for service mark infringement and unfair competition based on defendant's use of the name and mark CITICORP MORTGAGE COMPANY, INC. The court held that both the CITICORP mark and the CITI prefix were fanciful:

> [t]he mark "CITICORP" is a combination of a fanciful word "citi" combined with the abbreviation for the word corporation, "corp." "CITICORP" is not found in any dictionary, and therefore must be a fanciful word.

(Slip op. at 5–6).

Similarly, in *Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540 (11th Cir.1984), the Eleventh Circuit found the mark CITIBANK to be suggestive, and not descriptive, because "[t]he term 'Citi' does not describe a class of banking services or a characteristic of banking services." *Id.* at 1545. In *Citibank, N.A. v. City Bank of San Francisco*, 206 U.S.P.Q. 997 (N.D.Cal. 1980), in issuing a permanent injunction against defendant's CITY BANK mark, the court expressly found that the mark CITIBANK was not descriptive. *Id.* at 1005.

As marks that are suggestive, the CITI family of marks is inherently distinctive and entitled to a high degree of protection. *See Hasbro, Inc.*, 858 F.2d at 77.

In addition to inherent distinctiveness, the CITI family of marks has, through extensive advertising and promotion over the decades, garnered extraordinary acquired distinctiveness. Factors contribut-ing to distinctiveness in the marketplace include: evidence of significant revenue, advertising expenditures, national recognition and unsolicited media coverage. *See Patsy's Brand, Inc.*, 2001 WL 170672, at *10 (finding mark strong where plaintiff used mark for 7 years, advertised extensively, and achieved a high sales volume); *BIC Corps.*, 2000 WL 1855116, at *4 (plaintiff used mark for 34 years, spent $16 million in advertising, and grossed over $160 million in sales over eight years); *Stern's Miracle–Gro Prods., Inc. v. Shark Prods., Inc.*, 823 F.Supp. 1077, 1084–85 (S.D.N.Y.1993) (plaintiff used mark for fertilizer for over 41 years, invested approximately $100 million over ten years in advertising the mark, had national distribution and significant unsolicited media coverage).

In terms of consumer penetration, as early as 1984 more than 11 million U.S. households, or one out of every seven, was a customer of Citicorp. Throughout the 1970's and 1980's, millions of Americans had Citicorp/Citibank credit cards and millions of others received solicitations to become a credit card customer. Throughout the 1980's and 1990's, millions of U.S. households were customers of Citicorp/Citibank. In 1997, the number exceeded 20 million. Included within these totals were tens of thousands of U.S. households with Citicorp student loans. In addition, as of 1990, Citicorp Mortgage was servicing over 700,000 mortgages nationwide valued at $70 billion.

As reflected in Citicorp's Annual Reports and as found above, in 1980 Citicorp's revenue was approximately $3.7 billion, and its net income was approximately $499 million. In 1990, revenues exceeded $14 billion, and net income was approximately $458 million. By 1997, revenues exceeded $21 billion, and net income was approximately $3.6 billion.

For the years 1994 through 2000, Citigroup spent in excess of $3.0 billion domestically advertising and marketing its CITI services. During the years 1974–1984, Citicorp spent over $100 million on advertising CITI brand services throughout the United States. Citigroup and the CITI family of marks have received extensive unsolicited media coverage for decades.

In *CIT Group, Inc. v. Citicorp*, 20 F.Supp.2d 775 (D.N.J.1998), CIT Group challenged as trademark infringement and dilution Citicorp's proposed adoption of the mark CITIGROUP. In rejecting that challenge, the court held that "CITIGROUP is one more addition to the family of CITI names which, through extensive use and advertising have become internationally famous." *Id.* at 793; *see also Citibank, N.A. v. Citibanc Group, Inc.*, 724 F.2d 1540, 1547–48 (11th Cir.1984) (affirming district court finding that CITIBANK is a strong mark); *Citibank, N.A. v. City Bank of San Francisco*, 206 U.S.P.Q. at 1004 (finding that the "CITIBANK" mark "has now become world famous").

As of December 31, 2000, there were 22 marks in the CITI family that were incontestible, and thus, as noted, presumed distinctive for trademark purposes.

It must be concluded therefore that CITI is a strong and distinctive mark, and it has been held to be so as indicated by the authorities cited above.

What next must be considered is the similarity between the CITI and CITY marks which are identical aurally.

Citicorp's marks have the distinguishing second "I" in "CITI" and many of them are one word marks, compound words with a CITI prefix. Its enforcement efforts for many years have centered on marks which have the distinctive second "I," or which appropriate another characteristic typical of their family of marks, such as Citi or City immediately prior to "Bank"; or Citi or City made into a prefix in a compound single word mark denoting a financial service, such as "CITYBROKER."

■ In assessing the similarity factor, conflicting marks must be compared in their entireties; likelihood of confusion should not be predicated on the dissection of marks. *Keebler Company v. Murray Bakery Products*, 866 F.2d 1386, 1390 (Fed.Cir.1989). *See also* 3 *McCarthy on Trademarks* § 23:41, p. 23–112.

Citicorp has contended that "the I/Y difference between the parties' marks is insignificant[,]" going on to cite eleven cases where variants of marks have been held to infringe the original. However, none of those cases deal with a third party use of the variant in question. Here "the I/Y difference" has long been a predicate of Citicorp's own trademark protection policy. Implicit in that protection history is the admission that "City" is distinguishable from "Citi".

■ Although Citicorp has urged that City Holding has used "CITY" as a service mark in itself, its marketing director has stated that City does not use and does not intent to use "City" alone as a trademark. While some of his statements, and those of the president in a press release and certain passages in speeches and annual reports may use CITY as shorthand, the inference must be drawn in City Holding's favor and against the use of CITY as a service mark.

Both parties have on occasion used logos where "CITI" or "CITY" have been enlarged. Such treatment seeks to identify the family of marks by that word, but it must be noted that "CITY" has not been used alone.

The entire look of the marks, including "logos, typefaces and package designs," as

they appear in the marketplace, must also be considered. *WWW Pharmaceuticals, Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993). The respective logos and typefaces are different. City Holding's logos, to the extent that they do emphasize "City," emphasizing the difference between the "Y" and the "I" formulations by the typeface distinction.

In appearance the marks are significantly different.

◼ In terms of proximity of services, the marks are generically close and geographically disparate. Proximity has been said to address (i) whether and to what extent the two services compete, and (ii) the nature of the services and market structure. *See Morningside Group Ltd.*, 182 F.3d at 140 (finding proximity where both parties provided financial services); *Hasbro, Inc.*, 858 F.2d at 77 (finding proximity for manufacturers of action figures); *Nikon Inc.*, 987 F.2d at 95 (finding proximity where both parties sold cameras); *Lane Capital Mgmt., Inc.*, 15 F.Supp.2d at 398–99 (finding proximity where parties provided overlapping financial services).

Citigroup and City Holding offer comparable lines of banking and financial services as described in Citigroup's 2000 Annual Report and Form 10K with the comparable disclosure made by City Holding in its 1999 Annual Report and Form 10K.

"Bridging the Gap" refers to whether the senior user is likely to enter the junior user's market. *See Morningside Group Ltd.*, 182 F.3d at 141. This factor recognizes "the senior user's interest in preserving avenues of expansion and entering into related fields." *Id.* (citation omitted). "Bridging the gap" is likely when, as here, the parties are already in the same business. *See Nikon Inc.*, 987 F.2d at 95; *Consolidated Cigar Corp.*, 58 F.Supp.2d at 198.

The proximity of the services offered and the concomitant probability of bridging any gap between the offerings of the parties is offset by the economic and geographic realities. Citicorp has no bricks and mortar in West Virginia—its business is national and worldwide—and City Holding has almost 60 branches in West Virginia and has abandoned its effort at a national mortgage business. Further, of course, the objective test of proximity and bridging the gap is the existence of actual confusion in the marketplace. From the absence of any evidence of confusion, it is concluded that the markets in which the parties are operating are ships passing in the night, one for customers seeking national and international banking services and one for financial accommodations in West Virginia.

> If consumers have been exposed to two allegedly similar marks in the marketplace for an adequate period of time and no actual confusion is detected either by a survey or in actual reported instances of confusion, that can be [a] powerful indication that the junior trademark does not cause a meaningful likelihood of confusion.

*Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 228 (2d Cir.1999), *citing McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1136 (2d cir.1979).

West Virginia depositors have seen continuous usage of CITY NATIONAL BANK since 1957, and the operation of its bank branches in the state. Citicorp has solicited customers with solicitations for credit cards, travelers checks using its mark since the 1980's. In that time, no evidence of confusion between the parties' most prominent representatives of their group of marks; CITY NATIONAL BANK, and CITIBANK, has been pre-

sented, nor any evidence of generalized confusion between the groups.

Of course, it is well accepted that the Lanham Act does not require plaintiffs to show evidence of actual confusion to establish likelihood of confusion. *See Lois Sportswear, U.S.A., Inc.,* 799 F.2d at 876 (affirming summary judgment on likelihood of confusion where there was no actual confusion evidence); *see also BIC Corps.,* 2000 WL 1855116, at *6 ("where the marks and products are nearly identical, [lack] of actual confusion is 'not especially significant'") (citation omitted); *Kookai, S.A.,* 950 F.Supp. at 608 (finding likelihood of confusion despite lack of actual confusion evidence); *Stern's Miracle– Gro Prods., Inc.,* 823 F.Supp. at 1087 (same); *Toys "R" Us, Inc.,* 559 F.Supp. at 1198 (same) (citation omitted).

Here the distinctive quality of the CITI mark, the extent of usage of both marks, both in time and geography, and the nature of the services provided demonstrate that the aural identity is overcome by the written differentiation. Under such circumstances it is not appropriate to assume a confusion which has not been demonstrated to exist.

Citicorp has thus sought to establish the likelihood of confusion, as a matter of assumption, on the grounds that the actual competition between the I/Y marks took place only in the period from 1998 to 2000, when City Holding distributed its 20 million solicitations identifying City National Bank, City Home Lending, City Mortgage Services, and City Lending Services. The intensity of the City Holding effort and the absence of any actual evidence of confusion overcomes the Citicorp position.

The same considerations apply to an "initial interest" analysis. *See Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway & Sons,* 523 F.2d 1331, 1342 (2d Cir.1975); *see also* 3 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 23:3 (4th ed.2000). The distinction between the marks presented in a financial services context is sufficient to mitigate against an "initial interest" confusion.

While City Holding did not conduct a trademark search before launching its brief national campaign, it had been using its City National Bank mark since the late fifties without incident. Its modern logo was adopted in the 90's and co-existed with the CITI mark during that period until after the Citibank/Travelers merger and the national campaigns of both parties in the mortgage service field. There is no direct evidence of bad faith and to draw such an inference is not warranted by these circumstances and by the facts presented on this motion.

No evidence has been submitted with respect to the sophistication of the customers in the financial services market. Citicorp points out that a low level of consumer sophistication contributes to an increase in the likelihood of confusion. *See Consolidated Cigar Corp.,* 58 F.Supp.2d at 199, where a range of sophistication, including both less sophisticated and highly sophisticated consumers, may support a finding of likelihood of confusion. *See Nikon Inc.,* 987 F.2d at 95.

Citicorp has also urged that where there "is a high degree of similarity between the parties' services and marks, 'the sophistication of the buyers cannot be relied on to prevent confusion.'" *Morningside Group Ltd.,* 182 F.3d at 143 (citation omitted).

There would appear to be a difference between a one shot purchase of an item to wear or consume and initiating a continuing financial relationship. Sophistication of the consumers of the products at issue must be considered to weigh against the likelihood of confusion.

No evidence has been presented to differentiate between the financial services offered by the parties, but it is evident that the scope of the services differ. Citicorp is a national enterprise and City Holding is presently focused on the West Virginia area. Though there is no charge that City Holding's services are inferior, the scope of their offering is not equal to Citicorp's. The distinctions between national and regional is significant.

Two of the *Polaroid* factors predominate, the strength and suggestiveness of the CITI marks and the absence of any evidence of confusion. The predominance of the I/Y distinction relied upon by Citicorp is reinforced by this record.

The marks are dissimilar in appearance, and though the services are proximate, the national/regional gap has not been bridged. In the absence of bad faith, with purchasers who can be presumed to be more sophisticated than less as to services similar in quality but differentiated as to scope, the balance of *Polaroid* factors requires the conclusion that the Lanham Act has not been violated.

## II. *The Distinction Survives the I/Y Family Feud*

On this record and in the course of argument, as well as in its brief, Citicorp emphasized that "plaintiffs commenced this law suit after learning that defendants were creating a family of CITY marks in furtherance of a CITY branding strategy." It is the family against which Citigroup initiated this feud, but its outcome must turn on a *Polaroid* analysis of the marks themselves.

Citicorp has appropriately claimed a family of marks employing CITI. *J & J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460 (Fed.Cir.1991); *accord Quality Inns Int'l. Inc. v. McDonald's Corp.*, 695 F.Supp. 198, 212 (D.Md.1988).

As noted, CITIBANK was registered in 1960, CITICORP in 1974, and CITI in 1981. By 1980 plaintiffs had 27 federally registered marks in the CITI family, and by 1985 had more than 60. These CITI marks were used to market banking and financial services throughout the United States during the 1970's and 1980's (and ever since) for one of the world's most prominent banking and financial services companies.

However, the evaluation of the *Polaroid* factors set forth above concluded that City Holding's use of their family of CITY marks for financial services, in West Virginia, failed to create a likelihood of confusion with Citigroup's family of CITI marks.

It is the CITI "surname '[that] is distinctive enough to trigger recognition in and of itself.'" *Spraying Systems Company v. Delavan, Inc.*, 975 F.2d 387, 395 (7th Cir.1992). *See also Toys "R" Us, Inc. v. Feinberg*, 26 F.Supp.2d 639, 643 (S.D.N.Y. 1998) (Toys R Us asserts "gunsareus" domain name infringes; court finds "under factor (2), the marks are not similar. The absence of the use of plaintiffs' trademark "R" makes any association with plaintiffs' business implausible."); *Witco Chemical Co., Inc. v. Whitfield Chemical Co., Inc.*, 57 C.C.P.A. 804, 418 F.2d 1403, 1406 (Cust. & Pat.App.1969) (WIT- and WHIT—prefixes; finding no record of a "family" of WITmarks, as alleged by plaintiff, and stating: "We are unable to see how this is of particular significance since appellee is not seeking to register, and has not registered, a mark beginning with WIT-.").

No confusion with Citicorp has been established by the use of CITY.

Whether such an association is "in fact a reasonable consumer reaction is a matter of fact inherent in the determination of likelihood of confusion." 3 *McCarthy on*

*Trademarks,* § 23:61 at p. 23–168, 418 F.2d 1403. Citicorp has not yet established that the CITY family presents any threat distinct from the number of other "City" marks. City Finance, an entity with a prominent "CITY" in its logo has been doing the same business as plaintiffs at 100 locations across the southern United States.

Key to the resolution of this family feud is confusion between the marks and the scope and reach of the respective families. On such an analysis, a basis for relief has not been established.

The history of this action demonstrates that Citicorp's concern centers on the potential of competition from a family of CITY marks promoted nationally. That eventuality has not obtained, and the mere possibility of it doing so does not provide a basis for injunctive relief. As this record has established, Citicorp has co-existed over time with city, state or even regional "CITY" marks. Such co-existence would not necessarily bar a challenge by Citicorp to a national effort to advance a "CITY" mark which might well provide the basis for a conclusion that consumer confusion was likely. That issue has not been presented on these facts.

### Citigroup's Dilution Claims Are Dismissed

■ The Federal Trademark Dilution Act of 1995 ("FTDA") provides that the "owner of a famous mark" is entitled to protection from "another person's commercial use in commerce of a mark or trade name" that "causes dilution of the distinctive quality of the mark." 15 U.S.C. § 1125(c)(1). The FTDA defines dilution as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of (i) competition between the owner of the famous mark and the other parties, or (ii) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127.

In the Second Circuit, five elements are necessary to establish a claim under the FTDA: (1) the senior mark must be famous; (2) it must be inherently distinctive; (3) the challenged junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must be likely to cause dilution of the distinctive quality of the senior mark. *See TCPIP Holding Co.,* 244 F.3d 88 (2d Cir.2001); *Nabisco, Inc. v. PF Brands, Inc.,* 191 F.3d 208, 215 (2d Cir. 1999).

The FTDA sets forth the following eight non-exclusive factors to be considered by a court in determining a mark's fame:

(A) The degree of inherent or acquired distinctiveness of the mark; (B) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; (C) the duration and extent of advertising and publicity of the mark; (D) the geographical extent of the trading area in which the mark is used; (E) the channels of trade for the goods or services with which the mark is used; (F) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (G) the nature and extent of use of the same or similar marks by third parties; and (H) whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

15 U.S.C. § 1125(c)(1).

"Famous," as used in the FTDA, has its ordinary dictionary meaning. *See Nabisco, Inc.,* 191 F.3d at 215. As discussed in detail above in connection with the evaluation of the strength of CITI marks, there is no question that CITI family of marks is

famous within the meaning of the FTDA. The key marks in the CITI family had, by 1990, been in use for 15 to 30 years or more. Advertising expenditures have been in the range of hundreds of millions of dollars and the relevant trading area has been the United States as a whole since the early 1970's. Courts have so held. *CIT Group, Inc. v. Citicorp*, 20 F.Supp.2d at 793 ("CITIGROUP is one more addition to the family of CITI names which, through extensive use and advertising have become internationally famous"); *see also Citibank, N.A. v. City Bank of San Francisco*, 1980 WL 30239, 206 U.S.P.Q. at 1004 (finding that the "CITI-BANK" mark "has now become world famous").

With respect to the nature and extent of use by third parties, there are no other families of CITY or CITI marks used nationally in the banking and financial services area.

Under the facts already found and the conclusions reached, the CITI mark has not been diluted under these standards by continuing third-party use of various "CITY"-related marks. It is the family use of the "CITY" mark nationally that is the gravamen of the Citicorp complaint, but that family activity was abandoned by City Holding in 2000. Thus, there is no likelihood of dilution with respect to the use of the mark absent a national effort to advance a "CITY" mark.

■ As with a federal dilution claim, to establish a claim for dilution under New York law, a plaintiff must prove that its marks are distinctive and that there exists a likelihood of dilution. *See Hormel Foods Corp.*, 73 F.3d at 506 (*citing Sally Gee Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d cir.1983)).

The New York Dilution Statute provides:

*Injury to business reputation; dilution*

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360–1 (McKinney Supp.2001).

In analyzing likelihood of dilution, some courts have considered the "1) [S]imilarity of the marks, 2) similarity of the products covered by the marks, 3) sophistication of consumers, 4) predatory intent, 5) renown of the senior mark, [and] 6) renown of the junior mark." *Mead Data Cent., Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 875 F.2d 1026, 1035 (2d Cir.1989).

Here, under these circumstances as discussed, the distinctive CITI mark is not diluted by the dissimilar and conventional CITY mark. There has been no demonstration of predatory intent and the CITY mark, which is junior only in its family form, is renowned only in West Virginia. There is no evidence of dilution in New York. An injunction under the New York law is not warranted on the facts presented here.

### The Counterclaims are Dismissed

■ City Holding's counterclaims allege that Citicorp's adoption of the mark CITI-FINANCIAL infringes and dilutes its rights in CITY FINANCIAL CORP (the name for its brokerage business), adopted in October 1993, and that the mark CITI-MORTGAGE infringes defendants' rights in CITY MORTGAGE CORP and CITY MORTGAGE SERVICES, adopted in 1993 and 1996 respectively. Because Citicorp has a prior established family of marks identified by the word "CITI", the

use of CITIFINANCIAL and CITI-MORTGAGE is a protected use. Moreover, City Holding has not established the requisite fame to maintain its counterclaims.

### The CITI Family of Marks Provides a Complete Defense to the Counterclaims

The "common characteristic" of Citicorp's family of marks is "CITI." City Holding readily concede that the common characteristic of their family is "CITY." ("City Holding owns and uses a variety of 'City'-formative marks in West Virginia and other states"); ("City Holding Company ... owns a family of federal service mark registrations and applications, all of which incorporate a first word of CITY.").

As noted, by establishing a family of related marks, a trademark "owner can obtain protection even as to combinations of the family name which the owner does not use." *Chauvin Int'l Ltd. v. Goldwitz*, 927 F.Supp. 40, 48. McDonald's, for example, has prevented third parties from using its family characteristic "Mc" in connection with hotels, *see Quality Inns International, Inc.*, 695 F.Supp. at 216–21 ("McSleep"), dentistry services, *see McDonald's Corp. v. Druck & Gerner, DDS., P.C.*, 814 F.Supp. 1127, 1133–35 (N.D.N.Y. 1993) ("McDental"), and a bagel bakery, *see McDonald's Corp. v. McBagel's, Inc.*, 649 F.Supp. 1268, 1272–79 (S.D.N.Y.1986) ("McBagel's"), even though McDonald's itself had never used those specific marks and the usage thereof was not within the narrow scope of the trademark holder's traditional area of commerce.

As of 1990, a minimum of three years prior to defendants' first efforts to develop a CITY family of marks, Citicorp's family included approximately 60 federal registrations, with many marks consisting of CITI followed by a descriptive term as found above. Under family of marks principles, Citicorp is entitled to protection for marks

such as CITIMORTGAGE and CITIFINANCIAL even though they had not used those marks. In *CIT Group, Inc. v. Citicorp*, 20 F.Supp.2d 775, (D.N.J.1998), the court, in rejecting a similar challenge, specifically held that CITIGROUP was simply a new member of the internationally famous CITI family of marks. *See id.* at 793. *See also American Standard Inc. v. Scott & Fetzer Co.*, 200 U.S.P.Q 457, 459 (Trademark Tr. & App. Bd.1978) ("[T]he cloak of the 'family' will extend to and cover other members of the 'family' that are born and come into existence at a future date, even though they may be an intervening use.").

In sum, Citigroup's well-established, preexisting, broad family of CITI marks in the financial services area provides a complete defense to City Holding's counterclaims for trademark infringement and dilution.

### City Holding Has Not Established the Requisite Fame to Maintain its Counterclaims

Moreover, the Second Circuit has recently held that the degree of fame required for protection under the FTDA is "a substantial degree of fame." *TCPIP Holding*, 244 F.3d 88, 95 (2d Cir.2001) ("It seems unlikely that Congress intended to confer on marks that have enjoyed only brief fame in a small part of the country, or among a small segment of the population, the power to enjoin all other users throughout the nation in all realms of commerce.").

The West Virginia anti-dilution statute, W.Va.Code Ann. § 47–2–13, largely tracks the FTDA. There are, however, differences with respect to establishing fame. The statute delimits the extent of fame necessary to qualify for dilution protection as "famous in this state." W.Va.Code Ann. § 47–2–13(a) (Michie 1999). In addition, however, it requires the court to consider not only "[t]he degree of recognition

of the owner's mark in its ... trading areas and channels of trade in this state, but also the degree of recognition in the other's trading areas and channels of trade in this state." W.Va.Code Ann. § 47–2–13(a)(6) (Michie 1999).

Research found no reported cases interpreting the West Virginia Dilution Statute. However, the statute expressly authorizes reference to federal dilution cases as "persuasive authority." W.Va.Code ann. § 47–2–19(b) (Michie 1999).

Applying the *TCPIP* holding here, it is readily apparent that the defendants have no evidence indicating fame of the mark CITY FINANCIAL CORP. Here, City Financial has been in business for some 7 ½ years, has 8 employees, has no independent offices (its employees have space allocated in 4 City National Bank offices throughout West Virginia), had no revenues in the years 1998–2000, has insignificant advertising expenditures, and has approximately 1,400 customers, 80–85% of which were also customers of City National Bank, and 90% of which reside in West Virginia.

Even within the State of West Virginia, "City Financial Corp." is not a famous mark. City Financial's former president readily conceded that the local brokerage business market was dominated by major brokerage firms, including Merrill Lynch, Morgan Stanley, Dean Witter, Prudential Securities, and Salomon Smith Barney. Moreover, as noted, City Holding must show general recognition of the mark outside the brokerage business, and there is no such evidence. Accordingly, City Holding's state dilution claim should also be dismissed for failure to present a triable issue on this requisite element.

Summary judgment dismissing a trademark dilution case is appropriate when the party claiming dilution fails to raise any genuine issue of material fact that would enable a reasonable trier of fact to find

that the mark to be protected from dilution is famous. *See Something Old, Something New, Inc. v. QVC, Inc.*, No. 98 Civ. 7450 SAS, 1999 WL 125063, at *11 (S.D.N.Y. Dec. 8, 1999); *Scholastic Inc. v. Speirs*, 28 F.Supp.2d 862, 873 (S.D.N.Y. 1998), *aff'd mem.*, 199 F.3d 1323 (2d Cir. 1999) (text in Westlaw: 1999 WL 1024659 (2d Cir. Oct. 29, 1999)).

Because City Holding has not raised a genuine issue as to whether its City Financial or City Mortgage marks are "famous", nationally or in Virginia, and thus entitled to protection from dilution, and because the preexisting CITI family of marks provides a complete defense to the counterclaims, the counterclaims are dismissed.

### Conclusion

For the reasons set forth above, the Citicorp motion for judgment on its claims is denied, its federal and New York dilution claims are dismissed, and its motion to dismiss the counterclaims of City Holding and City National is granted.

It is so ordered.